**UNITED STATES of America, Plaintiff,**

v.

**Edward TRZASKA, Defendant.**

**No. 93 CR 1134.**

United States District Court, E.D. New York.

Oct. 21, 1994.

Zachary Carter, U.S. Atty., E. D. New York, Brooklyn, NY by Raymond Granger, Asst. U.S. Atty., for plaintiff.

Howard Jacobs, New York City, for defendant.

## MEMORANDUM & ORDER

KORMAN, District Judge.

Edward Trzaska is charged with possessing a firearm and ammunition in violation of

18 U.S.C. § 922(g)(1) (Supp.1994). The physical evidence, consisting of firearms, ammunition and firearms accessories, was seized from defendant's apartment in Queens, New York, and from a garage that was rented by the defendant several blocks away. The evidence was seized during two searches: one warrantless and one pursuant to a warrant. Trzaska moved to suppress the evidence, arguing that the warrantless search was unconstitutional and that the search pursuant to warrant was also invalid because the warrant was based upon information derived from the illegal search.

Because the warrantless search was nonconsensual and not subject to any exception to the warrant requirement, defendant's motion with respect to that search is granted. The search warrant, however, even when parsed of the evidence seized from the illegal search, is supported by probable cause. Accordingly, defendant's motion is denied with respect to the evidence seized pursuant to the warrant.

## BACKGROUND

After serving approximately one third of a twenty year sentence, following his conviction in 1983 for unlawful receipt of firearms, defendant was paroled in February 1990 to the supervision of the Probation Department of the Eastern District of New York. This was the second time the defendant had been paroled since the initial sentence was imposed in 1983. After violating the conditions of his first parole term by possessing twelve rifles and seven shotguns, the defendant was incarcerated until his release in 1990.

In May 1993, Probation Officer Kelley O'Keefe, who was supervising the defendant while he was on parole, received information from a confidential source ("CS") that the defendant was receiving a large volume of printed materials, magazines and mail-order catalogues from vendors that specialized in firearms and ammunition. In addition, the CS reported that defendant was receiving United Parcel Service ("UPS") shipments from a "Natchez Shooters Supply Company" located in Chattanooga, Tennessee. After inquiring with that company, Officer O'Keefe and agents of the Bureau of Alcohol, Tobacco and Firearms ("ATF") obtained invoices from shipments made to an "Ed's Sporting Goods" located at the same address as defendant's apartment on 118–17 15th Avenue in College Point, Queens. The invoices recorded the purchase of accessories for weapons and materials used to make "reloads," or ammunition reassembled from spent shell casings.

Based upon this information, Officer O'Keefe and the ATF officers undertook an examination of UPS shipping records that documented deliveries to defendant's apartment. Their investigation revealed that the defendant was receiving shipments from seventeen other weaponry supply stores. Invoices from several of these establishments reflected additional purchases of accessories for weapons and the materials necessary to manufacture ammunition. The shipments were made predominantly from February 1992 through June 1993. The defendant had also twice ordered similar supplies in the first few weeks of September 1993.

On September 25, 1993, Officer O'Keefe went to defendant's apartment to conduct a "routine home contact." Tr. of Supp'n Hr'g, Dec. 10 and Dec. 15, 1993 ("Tr.") at 16. According to her, although she was aware that defendant had received shipments from weaponry supply stores, she "sincerely did not believe that anything Mr. Trzaska might have been delivered would have been out in plain view." Tr. at 30. Thus, her visit was not intended to be a search, but just a "routine home contact" for the purpose of verifying defendant's residence. Tr. at 30–31. Officer O'Keefe was accompanied by Officer Eileen Kelly.

After speaking with the defendant briefly in the hallway outside his apartment, Officer O'Keefe asked the defendant whether the officers could come inside. See Tr. at 17. Trzaska acquiesced, and allowed the officers into the doorway of his one-room apartment. Officer O'Keefe then saw the defendant's son inside the apartment and heard the voice of a woman from behind a partitioned area. See Tr. at 18–19.

While speaking with the defendant for just a few minutes, Officer O'Keefe observed, un-

der a table to her right, a jar filled with what appeared to be bullets. *See* Tr. at 19, 35–38. Officer Kelly simultaneously observed, on top of a file cabinet, trays with shell casings and ammunition calibrators. *See* Tr. at 123, 126–27. They then exited the apartment without alerting the defendant to what they had seen.

Approximately one hour later, O'Keefe and Kelly returned to the apartment accompanied by four New York City Police Officers, who were brought along "for backup." Tr. at 19. Officer O'Keefe described what transpired as follows:

> We rang the bell. Mr. Trzaska opened the door. He—there was a police officer in front of me, and he [Trzaska] said, what's this, what's going on, something to that effect.

> I explained to him that I had observed bullets in a jar under his table and that I was there to seize that contraband, as well as the bullets that Officer Kelly had observed on top of some shelf to the right, and that we were going to look around his apartment and anything else that was in plain view we were also going to seize.

Tr. at 82. According to Officer O'Keefe, the defendant then said nothing, turned around, and walked up the stairs to his apartment. *See* Tr. at 21.

While the defendant's girlfriend and son were escorted outside the apartment by the police officers, Officers O'Keefe and Kelly then proceeded to conduct what they termed a "plain view search" of the premises. *See* Tr. at 125. That is, instead of "open[ing] drawers, look[ing] under things, push[ing] up ceiling tiles, look[ing] in cabinets and closets and refrigerators," the officers "merely stood in the middle of the room and looked, and everything that was in plain view that was considered contraband was seized." Tr. at 82–83. As a result of this search, a rifle, over 40 boxes and containers of ammunition, empty shell casings, and materials and instruments used to make ammunition, were seized. Officer O'Keefe then asked the defendant for his permission to conduct a more thorough search. The defendant refused to consent and the Probation Officers left without conducting a more intensive search.

After returning to her office to inventory the seized contraband, Officer O'Keefe contacted a neighbor of the defendant's and inquired whether the defendant was visible "taking anything out of his apartment." Tr. at 26. She was then informed that the defendant could be seen removing several bags and a box from his apartment, and placing them into a green Cadillac El Dorado. *Id.* Officer O'Keefe next queried the neighbor whether the defendant was unloading the materials into a garage that O'Keefe was aware the defendant was renting, at 22–01 119th Street in College Point. *Id.* When the neighbor later called back to reply in the affirmative, Officer O'Keefe and her colleagues rushed to the vicinity of the garage, and set up surveillance. The Probation Officers then observed the defendant passing by the garage at least six times in his car. Tr. at 27.

Several days later, ATF Special Agent Krissi Studwell prepared an affidavit that essentially recited the foregoing information. Based on that affidavit, search warrants were issued for both the apartment and the garage. The warrants were executed the following day. Among the items seized were thousands of rounds of ammunition, equipment used to make ammunition, and 44 firearms. The defendant was then indicted for possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).

The defendant now moves to suppress all of the seized evidence on the ground that the warrantless entry and "plain-view search" of his apartment was unconstitutional. Moreover, because the affidavit in support of the search warrants relates information derived from that search, the defendant argues that all items seized pursuant to the warrants are "fruits of the poisonous tree" that must likewise be suppressed.

## DISCUSSION

The United States Attorney argues that, on each of the two occasions the Probation Officers arrived at the defendant's apartment on September 25, they were acting pursuant to their "inherent" authority to conduct "home visits." *See* Letter of Raymond R. Granger, May 18, 1994 at 2. To be sure,

"home visits" by parole officers are among the lawful restrictions to which parolees have traditionally been subjected. *See, e.g., Diaz v. Ward,* 506 F.Supp. 226, 228–29 (S.D.N.Y. 1980) (interpreting home visit provision of New York State law). While there is no federal statute that expressly grants parole or probation officers the authority to conduct home visits, *see* 18 U.S.C. § 4201 et seq. (repealed 1984) (parole); 18 U.S.C. § 3601 et seq. (probation), in the probation context courts have implied such a mandate based upon the probation officer's general supervisory authority. *See United States v. Rea,* 678 F.2d 382, 387 (2d Cir.1982) (construing 18 U.S.C. § 3651); *United States v. Workman,* 585 F.2d 1205, 1208 (4th Cir.1978) (same).

A routinely performed visit to a parolee's home serves the purpose of verifying the parolee's residence, employment status, and other indicia of community adjustment. *See* Tr. at 29 (testimony of Officer O'Keefe). In *Diaz v. Ward,* a class action brought by parolees in the New York State system, Judge Haight prescribed the proper scope for such visits:

> In performing a home visit, a parole officer may properly be limited by the parolee to one room of the residence, where the parole officer, on the basis of his observation of the parolee and conversation with him, may gather the information necessary to achieve the visit's limited purposes.

506 F.Supp. at 228–29. "A visit, however, is not a search." *Workman,* 585 F.2d at 1208. In *Diaz,* Judge Haight noted the distinction between a search and a home visit. Rejecting the plaintiffs' contention that all home visits were in effect "searches" which required a warrant before entry, Judge Haight held that the "common sense distinction" between the two was that while searches were an intrusive, probing endeavor, home visits were much more restricted in scope. 506 F.Supp. at 228.

Professor White draws a similar distinction between home visits and those undertaken to search for evidence:

> In assessing the seriousness of a particular invasion of privacy, courts must consider not only the extent of the invasion but also the purpose of the officer making the invasion. Generally, a parole officer invading the privacy of his parolee will have two purposes. He will be seeking to obtain a clearer picture of the parolee's activities and personality and he will be looking for evidence which may be used to incriminate the parolee. The priority assigned by the officer to each of these goals will necessarily vary in accordance with the type of invasion he is making. For example, when the parole officer wants to determine the condition in which the parolee keeps his living quarters, he is probably seeking to achieve only the first goal; but when the parole officer searches the parolee's apartment after having been told the parolee is keeping narcotics there, the second goal is clearly paramount. The parole officer is in effect acting as a law enforcement officer when a parole officer invades the parolee's privacy primarily to obtain evidence for use against the parolee. Therefore, he should then not be granted wide freedom to invade the parolee's privacy on the ground that he is performing supervision which will enable the parolee to effectively rehabilitate himself.

Welsh S. White, *The Fourth Amendment Rights of Parolees and Probationers,* 31 U.Pitt.L.Rev. 167, 184–85 (1969).

In the instant case, when the Probation Officers first arrived at defendant's apartment on September 25, it may fairly be said that they conducted a "home visit"—as that term is generally understood in the parole context. *See Diaz,* 506 F.Supp. at 228. Because they were lawfully on the premises, the "plain view" doctrine would have allowed them to seize any evidence in plain view without violating the Fourth Amendment, although the regulations of the Parole Commission would have permitted such a seizure only with the consent of the parolee. *See Wilson v. United States,* 959 F.2d 12, 15 (2d Cir.1992). The Probation Officers, however, did not make any seizure at the time, nor did they ask the defendant to consent to such a seizure.

The Probation Officers chose, instead, to return an hour later with four New York

City Police Officers. They forcibly entered the defendant's apartment, they conducted a far more extensive "plain view" search of the premises and they seized items they saw without the defendant's consent. This was not a routine home visit. Indeed, Officer O'Keefe described the marked difference between this entry and the first visit. She testified that her first visit was a "routine home contact" whose purpose was to verify Mr. Trzaska's residence, which she had never seen before. Tr. at 28–30. She acknowledged, however, that the second visit was for a much different purpose.

After conducting the initial "home visit" Officer O'Keefe called her supervisor "and informed him ... that [she and Officer Kelly] were going to proceed to the 109th Precinct [of the New York City Police Department] for backup to go back and conduct a plain-view seizure of the bullets that [they] had seen." Tr. at 19–20. When she arrived at the defendant's home with her fellow Probation Officer and four New York City Police Officers, the defendant alarmingly inquired, "what's this, what's going on." Tr. at 82. Officer O'Keefe then answered him:

> Mr. Trzaska, I'm going to take the bullets that I saw underneath your table and I'm going to take the bullets that we saw on top of the file cabinet, and anything else that we see that's considered contraband we're going to take with us.

Tr. at 20. In the face of this overwhelming imposition, Trzaska did not say anything, but simply turned around and walked up the stairs to his apartment. Tr. at 21. Thus, even in Officer O'Keefe's view, her second visit was not a "routine home contact," but rather was a forcible entry undertaken for the purpose of conducting what she called a "plain-view seizure" of anything that she saw in the apartment that she considered contraband. Id. This was a search and seizure, albeit one that was somewhat limited in its breadth. See Arizona v. Hicks, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

█ The circumstances under which a probation officer (or parole officer) may forcibly enter the home of a parolee or probationer and make a warrantless search are limited to cases in which it has been authorized by a statute or a valid regulation of a parole board or where it has been expressly imposed as a condition of parole or probation by the judge who imposed the sentence. Griffin v. Wisconsin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); United States v. Giannetta, 909 F.2d 571 (1st Cir.1990). These holdings, which treat searches and seizures by parole and probation officers as administrative searches that are governed by the Reasonableness Clause of the Fourth Amendment, Griffin v. Wisconsin, 483 U.S. at 873, 107 S.Ct. at 3168, are premised on the principle that "what degree of surveillance is permissible in the individual case should not simply be left to the judgment of the supervising officer, but should be determined by the releasing authority...." 4 Wayne R. LaFave, Search & Seizure, § 10, at 140 (2d ed. 1987). As Professor LaFave continues, this position is eminently sound:

> [T]his matter is inextricably tied up with the decision which the releasing authority ... must make, for often the propriety of conditional release cannot be determined without knowing "if surveillance of a certain type was freely allowed." Moreover, the rehabilitative objective is better served if the probationer or parolee is put on notice at the time of release as to what intrusions into his privacy are deemed a permissible aspect of his conditional release.

Id. at 141, quoting Welsh S. White, The Fourth Amendment Rights of Parolees and Probationers, 31 U.Pitt.L.Rev. at 184.

In Griffin v. Wisconsin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), the leading Supreme Court case in the area, the probation officers who searched a probationer's home without a warrant did so pursuant to an administrative regulation which authorized such warrantless searches if there were "reasonable grounds" to believe that contraband was present. Id. at 871, 107 S.Ct. at 3167. Accepting the finding of the Wisconsin courts that "reasonable grounds" were in fact demonstrated under the circumstances of that case, the Supreme Court then concluded that because of the "special needs" of Wisconsin's probation system, searches pursuant to the regulation were reasonable within the

**104**

meaning of the Fourth Amendment. *Id.* at 875–880, 107 S.Ct. at 3169–3172.[1]

While *Griffin* upheld a warrantless entry and seizure because it was carried out pursuant to a published administrative regulation "that itself satisfies the Fourth Amendment's reasonableness requirement under well established principles," *id.* at 873, 107 S.Ct. at 3168, "where the challenged probation search is authorized *neither* by a general statute or regulation *nor* by 'narrowly tailored restrictions included within a probation agreement,' then that search is unlawful under *Griffin.*" 4 Wayne R. LaFave, *Search & Seizure,* § 10.10 (2d ed. 1987) (1994 Pocket Part at 23). *See United States v. Rea,* 678 F.2d 382, 387 (2d Cir.1982); *United States v. Bradley,* 571 F.2d 787, 788 (4th Cir.1978) (holding, pre-*Griffin,* a nonconsensual warrantless search of a parolee's or probationer's home is unreasonable within the meaning of the Fourth Amendment); *United States v. Wryn,* 952 F.2d 1122, 1125 (9th Cir.1991) (holding, post-*Griffin,* that warrantless search of probationer's residence was unconstitutional where conditions of probation did not authorize such a search, despite regulatory authority to impose such authorization).

The United States Attorney is unable to cite any statute or regulation of the Parole Commission that authorized the forced entry at issue here. Nor did the conditions of parole set by the Commission require the defendant to even consent to such an entry. The only arguably relevant condition reads as follows:

12. You shall permit confiscation by your probation officer of any materials which your probation officer believes may constitute contraband in your possession and which your probation officer observes in plain view in your residence, place of business or occupation, vehicle(s) or on your person.

Conditions of Release on Certificate of Parole, Edward Trzaska, Feb. 23, 1990. The conditions of release further specify that "[i]f the release [sic] fails to comply with any of the conditions listed above, the release [sic]

may be summoned to a hearing or retaken on a warrant issued by a Commissioner of the U.S. Parole Commission and reimprisoned pending a hearing to determine if the release should be revoked." *Id.* The reverse side of the Certificate of Parole contains the following acknowledgment by the defendant:

I have read, or had read to me, the conditions of release printed on the reverse side of this certificate and received a copy thereof. I fully understand them and know that if I violate any, I may be recommitted.

*Id.*

■ The applicable regulations of the Parole Commission provide that, "[w]hen observing contraband in plain view during a regular supervisory visit, a parole officer may seize evidence only with the parolee's consent." *See Wilson v. United States,* 959 F.2d 12, 15 (2d Cir.1992) (citing 28 C.F.R. § 2.40(a)(12); Parole Commission Procedures Manual at 113, para. 2.40–14(a), (b)). While the refusal of the parolee to consent may constitute grounds for violation of his parole, the Probation Officers lack the "seizure power" of other law enforcement officers. *See* 959 F.2d at 15. Indeed, in granting the defendant parole, the Parole Commission did not impose upon defendant the condition, authorized by the regulations, that would have required the defendant "to permit the U.S. Probation Officer to conduct searches and seizures of concealed contraband" in, among other places, the defendant's residence, "at such times as the U.S. Probation Officer shall decide." 28 C.F.R. § 2.40(a)(12). Accordingly, the Probation Officers here were not authorized to forcibly enter the defendant's apartment and seize contraband or evidence in plain view.

■ In the absence of such explicit authorization, the power to enter the defendant's apartment for the purpose of conducting a search without a warrant required a voluntary consent. The defendant, however, did not voluntarily consent to the second entry into his apartment. Nor was he asked to

---

1. The holding in *Griffin* has also been applied to searches directed at parolees. See *United States v. Hill,* 967 F.2d 902 (3d Cir.1992); *United States*

*v. Cardona,* 903 F.2d 60, 63 (1st Cir.1990) (same); *Diaz v. Ward,* 1987 WL 26841, *2 (S.D.N.Y. Nov. 27, 1987).

consent to the seizure of property in his apartment. On the contrary, he did no more than acquiesce to a claim of lawful authority. Such acquiescence is not sufficient to justify the warrantless entry into his apartment. *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Because the Probation Officers were not lawfully in the defendant's apartment, they could not seize contraband or evidence in plain view. *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971).

■ The conclusion that the evidence seized during the second visit is the fruit of an illegal search and seizure does not necessarily require the suppression of the evidence obtained pursuant to the subsequent warrants that were issued for the full-blown search of the apartment and the garage. This is true even where the illegally seized evidence may have contributed to the probable cause finding. In *United States v. Thomas,* 757 F.2d 1359 (2d Cir.1985), the Court of Appeals suggested that the good faith exception to the exclusionary rule would apply where the issuing magistrate was apprised of the manner in which the earlier (problematic) search was conducted and nevertheless authorized a subsequent search based on the fruits of the earlier search.

While the affidavit here referred to the warrantless search of the apartment and listed the items recovered from that search, it neglected to mention that the Probation Officers had first left the defendant's apartment and then later returned to make a forced entry and warrantless search. *See* Affidavit of Krissi Studwell, Sept. 28, 1993, at ¶ 7. This omission made it appear that the Probation Officers had seized the items in plain view during the initial home visit and failed to apprise the United States magistrate judge that the items listed were seized in a subsequent forcible warrantless entry. The failure to apprise the issuing magistrate of these facts precludes reliance on the good faith exception to the exclusionary rule.[2]

■ A warrant that is issued upon an affidavit that relies upon illegally obtained evidence may, nevertheless, be sustained if the other evidence relied upon by the issuing magistrate is sufficient to establish probable cause. *United States v. Marchand,* 564 F.2d 983, 992–994 (2d Cir.1977) (Friendly, J.), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978); *United States v. Taborda,* 635 F.2d 131, 141 (2d Cir.1980); *United States v. Ferguson,* 758 F.2d 843, 849 (2d Cir.1985). This line of authority is sufficient to sustain the warrants at issue here.

■ The Probation Officers here had probable cause, prior to the forcible entry into the defendant's apartment, to believe that the defendant had in his possession firearms, ammunition, records and receipts, including UPS delivery receipts and related items described in the warrant. The defendant's propensity to possess firearms illegally was amply evidenced by his conviction for possessing firearms illegally and the initial parole violation for the same conduct. *See* Welsh S. White, *The Fourth Amendment Rights of Parolees and Probationers,* 31 U.Pitt.L.Rev. at 196 (1969) ("In certain situations, the parolee's prior criminal activity may be a circumstance which can properly be considered in determining whether or not there is probable cause"). This evidence, when combined with the information from the informant and the corroborating observations made by the Probation Officers during the lawful "home visit," provided more than sufficient basis for a warrant to search the apartment. Accordingly, even without considering the evidence obtained during the illegal entry on September 25, 1993, the United States magistrate judge could conclude that there was probable cause for the warrant.

■ Moreover, after the second "plain view" search and seizure occurred, the defendant was observed by the CS "leaving his apartment carrying two large garbage bags, one box and several shopping bags filled with unidentified objects." The defendant was seen placing the items in the trunk of a

---

2. The other minor inaccuracies in the affidavit, which the defendant cites, are not material. Accordingly, they do not undermine the validity of the warrant. *See Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

green Cadillac Eldorado, driving to the garage located at 22–01 119th Street, College Point, Queens, and unloading the bags and boxes into the garage. When the Probation Officers arrived at the garage some forty minutes later to conduct surveillance of the garage, they observed the defendant drive by the locked garage some seven times in a period of an hour and a half. This evidence was sufficient to support the conclusion that the defendant had moved to the garage at least some of the evidence and contraband that had not been discovered during the "plain view" search of his apartment.

While the defendant may have engaged in this activity because of the initial illegal entry, his conduct was too attenuated from the entry to be deemed a suppressible fruit of it. This was not a case in which the defendant attempted to dispose of evidence when the illegal entry was taking place. Instead, after the Probation Officers left the apartment, the defendant made a conscious decision to remove at least some of the items that had not been discovered. Nor is this a case in which the illegal activity was undertaken with the purpose of causing the defendant to engage in such activity or in which the conduct of the Probation Officers was flagrantly unlawful. *See Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975) ("purpose and flagrancy of the official misconduct" are "particularly relevant" in deciding whether doctrine of attenuation should be applied); *Rawlings v. Kentucky*, 448 U.S. 98, 110, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633 (1980) ("the conduct of the police here does not rise to the level of conscious or flagrant misconduct requiring prophylactic exclusion of petitioner's statements"). Indeed, if the defendant's conduct can be said to be the fruit of anything, it is the fruit of the effort of the Probation Officers to limit the nature of the intrusion and obtain a warrant to conduct a full-blown search of the apartment.

Moreover, while the "plain view seizure" they conducted before leaving to obtain a warrant, along with the information available to them prior to that search, led the Probation Officers to suspect that the defendant would attempt to remove evidence that they had not yet discovered, it would be absurd to hold that their good faith effort to limit the initial scope of the warrantless search of the apartment precluded any further investigative effort on their part. Indeed, if the forcible entry and warrantless "plain view search" did not preclude the issuance of a search warrant for defendant's apartment, then it follows that the Probation Officers could take steps to determine whether the defendant was moving evidence and contraband to prevent their lawful seizure. *See Segura v. United States*, 468 U.S. 796, 809, 104 S.Ct. 3380, 3387–3388, 82 L.Ed.2d 599 (1984).

It is true that, if the illegal entry had not taken place, the defendant may not have removed the evidence from his apartment. In this sense, the conduct of the Probation Officers could be considered the "but for" cause of the ultimate seizure of this evidence in the defendant's garage. "But at this juncture, we are reminded of Justice Frankfurter's warning that '[s]ophisticated argument may prove a causal connection between information obtained through [illegal conduct] and the Government's proof,' and his admonition that the courts should consider whether '[a]s a matter of good sense ... such connection may have become so attenuated as to dissipate the taint.'" *Segura*, 468 U.S. at 816, 104 S.Ct. at 3391, *quoting Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). This is such a case.

### CONCLUSION

The defendant's motion to suppress evidence seized as a result of the forcible warrantless entry into his apartment on September 25, 1993 is granted. The motion to suppress the evidence seized pursuant to the warrants issued several days later is denied.

SO ORDERED