UNITED STATES of America, Plaintiff,

v.

**Edward TRZASKA, Defendant.**

No. CR–93–1134.

United States District Court,
E.D. New York.

April 13, 1995.

---

Zachary W. Carter, U.S. Atty., E.D. of N.Y., Brooklyn, NY by Raymond Granger, Asst. U.S. Atty., for plaintiff.

Howard Jacobs, New York City, for defendant.

## *MEMORANDUM*

KORMAN, District Judge.

At a pre-trial suppression hearing, I granted Edward Trzaska's motion to suppress a rifle and ammunition that were obtained as part of an illegal search of his apartment. *United States v. Trzaska,* 866 F.Supp. 98 (E.D.N.Y.1994). The defendant did not move to suppress a statement he made to one of the Probation Officers after the evidence was found in his apartment—"I'm a drug addict with this. Its a sickness." At the outset of the trial, however, the Assistant United States Attorney commendably volunteered not to offer this statement, because "having re-examined the issue, and in light of my role in this litigation ... a fair reading of your opinion ... would [suggest] that it was the fruit of the search, so I just want Your Honor to know we will not bring it up." Tr. at 3.

Edward Trzaska was then tried and convicted of possessing a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) (Supp 1994). The firearms that were the subject of the indictment were found in a container in a garage that was rented by the defendant. In the course of the trial, the defendant's son, Kevin Trzaska, testified that, at his father's direction, he had picked up these firearms from his father's friend Hank Wagman. The following exchange took place between defense counsel and Kevin on direct examination:

Q. Do you know why your father asked you to pick them up?

A. He didn't want nothing to do with them anymore.

Q. Did he tell you why didn't want to have anything to do with them?

A. Because he had too many problems in his past, and he—he wanted to put it down.

Tr. at 200.

These out-of-court statements of Edward Trzaska were offered in order to prove that he was no longer involved with guns and that he was, therefore, not illegally in possession of the firearms as charged. Indeed, in summation, defense counsel relied upon them for this very purpose:

"He (Kevin) told you his father did not want to have anything to do with them (the guns). He knew it was trouble. He knew that he was a convicted felon, and therefore was in a different category than his son. He knew that if he took those guns into his possession and kept them, that not only was he risking the violation of parole, but he was also risking sitting right where he's sitting right now. So he tells his son, 'they're yours.'"

Tr. at 293–94.

Trzaska's statement to the Probation Officer—"I'm a drug addict with this; its a sickness"—was made with respect to the munitions found in his apartment and not those firearms found in the garage that the defendant was charged with possessing and that the defendant's son claimed were his. Nevertheless, the defendant's admission that he suffered from a narcotic-like addiction to guns, combined with the fact that firearms at issue were found in the garage that he rented, undermined the credibility of the out-of-court statement that was attributed to him by his son. Under these circumstances, I concluded that the previously excluded admissions to the Probation Officer could be used to impeach the out-of-court statement the defendant made to his son regarding his intent to relinquish ownership of the firearms found during the legal search of the garage.

The jury was given the following limiting instruction at the time the previously excluded statement was admitted: "... the limited purpose and the only purpose that I'm admitting this testimony is for you to evaluate ... the credibility of the statement that was at-

tributed to the defendant by his son." Tr. at 271. Moreover, the jury was warned that the firearm and ammunition illegally seized from the defendant's apartment that prompted his statement to the Probation Officer could not be considered as evidence of defendant's guilt under the indictment but that "the testimony about what the agent took or saw at that time is only being admitted to place in context the remark allegedly made by the defendant." Tr. at 271.

While the Supreme Court has held that illegally seized evidence can be used for the purpose of impeaching a defendant who testifies in his own defense, *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), it has also held that a witness called by the defendant may not be impeached by illegally seized evidence. *James v. Illinois,* 493 U.S. 307, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990). The purpose of this post-verdict memorandum is to explain in detail why the broad animating purpose of *Walder* and its progeny—to prevent defendants from using or allowing false and misleading evidence to reach the jury while the truth is kept hidden by the exclusionary rule—and not the reasoning of the *James* decision, applies to the instant situation where a defense witness on direct examination testifies to an exculpatory out-of-court statement made by the defendant.

## Discussion

The evolution of the impeachment exception to the exclusionary rule charts the Supreme Court's attempt to balance the deterrent effect of the rule against the cost to the truth seeking process of excluding relevant evidence. The exception arose out of concern that the shield provided by the exclusionary rule would be "perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). As Justice Frankfurter observed, "it is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths." *Walder v. United States,* 347 U.S. at 65, 74 S.Ct. at 356.

In *Walder,* the Supreme Court permitted the use of evidence obtained through an illegal search to impeach the credibility of the defendant's assertion on direct examination that he never possessed narcotics. In *Harris,* the Supreme Court held that a confession, which was obtained without advising the defendant of his rights to counsel and to remain silent, but which was otherwise voluntary, could be used to impeach exculpatory evidence offered by the defendant at trial. While this holding arguably did not increase the incentive of law enforcement officers to avoid giving *Miranda* warnings, because they still risked losing the otherwise admissible confession that defendants frequently give even after being properly warned, the subsequent holding in *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), created a much more significant incentive to avoid full compliance with *Miranda.*

The Supreme Court there held that a statement taken from a defendant who had been warned of his rights and who had requested counsel could be used to impeach subsequent exculpatory testimony by a defendant. Because it is common knowledge that honoring a defendant's request to consult with a competent attorney will mean no confession at all, law enforcement officers have little incentive to cease questioning after a defendant invokes his right to counsel.[1] At the very least, by continuing to interrogate the defendant, they may obtain evidence that will either keep the defendant from testifying or impeach him if he does so. Notwithstanding this obvious incentive to violate *Miranda,* the Supreme Court struck the balance in favor of deterring perjurious testimony. A similar balance was struck in *United States v. Havens,* 446 U.S. 620, 100 S.Ct.

---

1. As Justice Jackson observed, "any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances." *Watts v. State of Indiana,* 338 U.S. 49, 59, 69 S.Ct. 1347, 1358, 93 L.Ed. 1801 (1949).

1912, 64 L.Ed.2d 559 (1980), which permitted prosecutors to introduce illegally obtained evidence to impeach a defendant's "answers to questions put to him on cross-examination that are plainly within the scope of the defendant's direct examination." at 627, 100 S.Ct. at 1916.

The Supreme Court, however, declined to follow the *Walder* line of cases in *James v. Illinois*, 493 U.S. 307, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990). There, the prosecution introduced eyewitness testimony that James shot the victim while wearing shoulder-length "reddish" hair in a slicked-back "butter" style. At trial, James's hair was short, black, and worn in a "natural" style. James produced a witness who testified that James wore short black hair on the day of the crime. In rebuttal, the prosecution was allowed to introduce James's suppressed statement in which he admitted to wearing long reddish hair on the day of the shooting.

In a five to four decision, the Supreme Court held that illegally obtained evidence could not be used to impeach defense witnesses other than the defendant himself. Justice Brennan wrote for the majority that, while the use of illegally seized evidence to impeach a defendant "generally discourages perjured testimony without discouraging truthful testimony," expanding the impeachment exception to encompass the testimony of all defense witness "would not have the same beneficial effects." *Id.* at 314, 110 S.Ct. at 652.

Justice Brennan reasoned that whatever the case may be with respect to the defendant's testimony, the threat of a criminal prosecution for perjury is sufficient to deter defense witnesses from intentionally lying on a defendant's behalf. On the other hand, allowing defense witnesses to be impeached by illegally seized evidence would likely chill some defendants from putting forth their best defense. Because defendants "sometimes need to call 'reluctant' or 'hostile' witnesses who will not share the defendant's concern for avoiding statements that invite impeachment through contradiction," and also because "defendants often cannot trust even 'friendly' witnesses to testify without subjecting themselves to impeachment, sim-

ply due to insufficient care or attentiveness," the Supreme Court concluded that defendants, fearing the impeachment of their witnesses with illegally obtained evidence, will be more hesitant in calling witnesses who would otherwise offer probative evidence. *James*, 493 U.S. at 315, 110 S.Ct. at 653.

Justice Brennan also concluded that the proposed expansion would significantly weaken the exclusionary rule's deterrent effect on police misconduct by vastly increasing the number of occasions on which such evidence could be used since many more defense witnesses take the stand than do defendants. "[D]ue to the chilling effect identified above, illegally obtained evidence holds even greater value to the prosecution for each individual witness than for each defendant." *Id.* at 318, 110 S.Ct. at 655.

The considerations underlying *James* are not applicable here. Unlike the *James* situation, the defendant himself is the real witness. As the Advisory Committee Note to Fed.R. of Evid. 806 aptly observes, "the declarant of a hearsay statement which is admitted in evidence is in effect a witness. His credibility should in fairness be subject to impeachment and support as though he had in fact testified." More significantly, the threat of a perjury prosecution does not pose any realistic deterrent to the introduction of out-of-court statements that are fabricated or false. The defense witness does not face a meaningful risk of a perjury conviction because, even if the out-of-court statement attributed to the defendant is fabricated, the only witness to the falsehood is the defendant. On the other hand, if the witness is accurately relating what the defendant said to him, then he is not subject to any prosecution even if the statement to which he is testifying is false. Of course, the prosecution of the defendant for perjury or obstruction of justice is even more unlikely here than when he testifies falsely under oath.

Moreover, in contrast to *James*, allowing illegally seized evidence to impeach the veracity of a defendant's out-of-court statement is not likely to unfairly chill defendants from presenting their best defense. While in some circumstances a defendant might reasonably fear that a defense witness would

intentionally or accidently make some statement in sufficient tension with the tainted evidence so as to allow the prosecutor to use that evidence for impeachment purposes, it is far less likely that a defense witness on direct examination would, through insufficient care or attentiveness, unexpectedly volunteer an out-of-court statement of the defendant's in conflict with the excluded evidence. While it may be of some concern to a defendant that the prosecutor would deliberately attempt to elicit an exculpatory statement made by the defendant for the purpose of impeaching it, the use of illegally seized evidence for impeachment in the present context could be limited to statements made by defense witness on direct examination.[2]

While "inadmissibility of illegally obtained evidence must remain the rule and not the exception", *James*, 493 U.S. at 319, 110 S.Ct. at 655, the balance of interests between the truth seeking function of the trial and the protections of the exclusionary rule support application of the impeachment exception where a defendant offers his own exculpatory statements through a defense witness. The concern of the *James* Court, that permitting impeachment of defense witnesses would significantly undermine the deterrent effect of the exclusionary rule, is simply not valid here. Because illegally seized evidence can already be used to impeach the in-court testimony of a defendant, allowing its use to impeach an out-of-court statement by the defendant does not provide an additional incentive for law enforcement officers to obtain evidence illegally.

Moreover, any such incentive is further reduced by the narrow area in which the illegally seized evidence may be used. The out-of-court statement of the defendant must not be elicited by the prosecutor, but must be an assertion intentionally offered on direct examination that is inconsistent with the oth-

erwise inadmissible evidence. Unlike the broad rule allowing impeachment of any testimony offered by a defense witness, which *James* rejected, the more limited use of illegally seized evidence permitted here would not vastly increase the opportunity for impeachment. The suppressed evidence could be used only in the rare occasion where a defense witness offers an exculpatory out-of-court declaration by the defendant, which is not subject to an objection based on hearsay or is admitted without objection.

Accordingly, the admission of the illegally obtained statement of Edward Trzaska in order to rebut the out-of-court statement offered by his son Kevin on direct examination, was a proper application of the impeachment exception to the exclusionary rule.[3]

---

2. The *James* majority did suggest that "even the more limited expansion of the impeachment exception would palpably inhibit defendant's presentation of a defense," *Id.* at 316 n. 6, 110 S.Ct. at 654 n. 6, but there is less force for this concern where a defendant makes use of a witness to introduce his own out-of-court statement.

3. *See Wilkes v. United States*, 631 A.2d 880 (1993) (broadly interpreting *Walder* and narrowly read-

ing *James* in finding that the search for truth outweighs the deterrent function of the exclusionary rule, justifying the use of illegally obtained evidence for impeachment of a defense witness when defendant offers the testimony of an expert in the course of presenting an insanity defense and the expert's opinion is based on statements made to the expert by the defendant).