**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 25 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

VERNOIL CANTLEY, aka Joe Joe
Cantley,

Defendant-Appellant.

No. 96-6290

---

Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. CR-95-169-A)

---

Joseph L. Wells, Oklahoma City, Oklahoma, for Appellant.

Leslie M. Maye, Assistant United States Attorney (Patrick M. Ryan, United States
Attorney, with her on the brief), United States Attorney's Office, Oklahoma City,
Oklahoma, for Appellee.

---

Before **SEYMOUR,** Chief Judge, **McKAY** and **MURPHY,** Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

Appellant Vernoil Cantley was convicted of conspiracy to distribute cocaine base ("crack"), in violation of 21 U.S.C. § 846; use of a wire transfer to facilitate possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 843(b); being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); five counts of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1); and six counts of distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1).

The Presentence Investigation Report ("PSR") calculated Cantley's base offense level at 38, premised on approximately seven kilograms of cocaine base and 174 grams of marijuana. The PSR recommended the district court apply a two-level enhancement for possession of a firearm pursuant to U.S.S.G. § 2D1.1(b)(1) and a four-level enhancement for Cantley's leadership role in the conspiracy pursuant to U.S.S.G. § 3B1.1(a). Based on a total offense level of 44, the district court sentenced Cantley to life imprisonment and five years supervised release on the conspiracy count and each of the possession and distribution counts; to imprisonment for a term of forty-eight months and one year supervised release on the use of a wire transfer to facilitate possession count; and to imprisonment for a term of 120 months and three years supervised release on the felon in possession of a firearm count, all to be served concurrently.

On appeal, Cantley contends the district court erred by (1) denying his motion to suppress certain evidence; (2) sentencing him under the crack cocaine guideline; (3) applying a four-level enhancement for his role as an organizer or leader; and (4) failing to require the government to assume the burden of proof on contested sentencing issues. This court affirms.

**A. Motion to Suppress**

Cantley argues the district court erred by denying his motion to suppress evidence seized during searches of his residence and the hotel room in which he was arrested.

At the suppression hearing, Cantley's parole officer, Arnold Nelson, testified as to the events surrounding the search of Cantley's residence. While on parole[1] in March 1992, Cantley tested positive for marijuana use, but parole revocation proceedings were not initiated at that time. On July 26, 1993, Officer Nelson received a telephone call from a DEA agent, who advised him that Cantley was under investigation by both the DEA and Oklahoma Bureau of Narcotics ("OBN") for drug trafficking. That same day, Officer Nelson left messages with two OBN agents to get additional information about the investigation, but they never returned his call.

---

[1]Cantley was convicted of armed robbery in 1985 and was paroled in 1991.

On August 11, 1993, Officer Nelson received an anonymous telephone call informing him that Cantley was in court that day on a firearms possession charge. He later verified this information with the clerk's office and district attorney's office. Officer Nelson immediately began preparing a parole violation report based on Cantley's arrest for the firearm charge, failure to report the arrest,[2] and possession of marijuana based on the March 1992 positive drug test. On August 16, Officer Nelson submitted the violation report to the Department of Corrections Executive Revocation Officer, and on August 25, an arrest warrant was issued.

The day Officer Nelson received the arrest warrant, August 30, he contacted OBN to let them know he was going to execute the warrant. OBN asked Officer Nelson to "sit on it for a while" because they were afraid Cantley would make bond and flee. Officer Nelson then asked OBN to update him on their investigation. Based on the new information he received, Officer Nelson requested and received authorization from his district supervisor to conduct a warrantless search of Cantley's residence.

---

[2]In violation of his parole agreement, Cantley failed to inform Officer Nelson that he was arrested on the firearms charge.

The next day, August 31, Officer Nelson, along with two OBN agents[3] and four Corrections officers, went to Cantley's residence to conduct the warrantless search. Sharon Cantley, defendant's wife, answered the door, let the officers in, and told them Cantley was not home. The officers requested Ms. Cantley's permission to search the entire residence. When she refused, they went forward with the warrantless search. After the officers confirmed that Cantley was not present, they searched his bedroom and the common areas of the residence.[4] Among other things, the officers found crack cocaine, digital scales which tested positive for cocaine, and a loaded pistol.

The district court determined that in light of the information known to Officer Nelson, there was a reasonable basis for searching Cantley's residence. Additionally, the district court concluded that each of the requirements for conducting a warrantless search were satisfied. The district court therefore denied Cantley's motion to suppress.

"On appeal from a denial of a motion to suppress, we view the evidence in a light most favorable to the government and accept the district court's findings of historical fact unless clearly erroneous." *United States v. Lewis*, 71 F.3d 358,

---

[3]Officer Nelson testified that it was the department's policy to have agents from another law enforcement agency present as backup.

[4]In April 1993, Officer Nelson had conducted a "residence verification" of Cantley's home. During this interview, Cantley explained which bedroom he shared with his wife and which bedrooms belonged to others in the household.

360 (10th Cir. 1995); *see also United States v. McCarty*, 82 F.3d 943, 947 (10th Cir.), *cert. denied*, 117 S. Ct. 257 (1996). "The reasonableness of a search and seizure under the Fourth Amendment is a question of law we review de novo." *McCarty*, 82 F.3d at 947; *see also Lewis*, 71 F.3d at 360.

The Fourth Amendment protects against unreasonable searches and seizures. *See* U.S. Const. amend. IV. "Generally, law enforcement officials should conduct searches pursuant to a warrant supported by probable cause." *Lewis*, 71 F.3d at 361. The Supreme Court, however, has recognized exceptions to the warrant requirement for certain "special needs" of law enforcement, including a state's parole system. *See Griffin v. Wisconsin*, 483 U.S. 868, 873-75 (1987); *see also Lewis*, 71 F.3d at 361. Accordingly, a warrantless search of a parolee's residence "will satisfy the Fourth Amendment's reasonableness requirement to the extent parole agents [carry] it out pursuant to state law which itself satisfies the Fourth Amendment's reasonableness requirement." *Lewis*, 71 F.3d at 361.

According to the Oklahoma Probation and Parole Manual ("Manual") in effect as of the date Cantley's residence was searched, a parole officer was allowed to conduct a warrantless search if four requirements were met and the district supervisor approved the search. *See* Probation and Parole Manual ch. 3, at 4 (Dec. 1, 1992). The four requirements were:

(a) There are reasonable grounds to believe that the offender is keeping contraband on the property. (b) Failure to search may result in an immediate threat to the public, employees, or offenders. (c) The search is not the result of an assistance request from other law enforcement officers who have been unable to obtain a search warrant. (d) Officers are not authorized to break and enter at an offender's residence . . . to conduct a warrantless search.

*Id.* The Manual also provided that "[s]earches [shall] not invade the privacy of a third party." *Id.*

In *State ex rel.Corgan v. King*, 868 P.2d 743 (Okla. Crim. App. 1994), the Oklahoma Court of Criminal Appeals considered for the first time what constitutes a "reasonable" warrantless search of a parolee's residence and concluded that a search which complies with the Manual[5] is reasonable for Fourth Amendment purposes. *See id.* at 746. We agree that the prerequisites to a warrantless search of a parolee's residence in Oklahoma comply with the reasonableness requirement of the Fourth Amendment. *See Griffin*, 483 U.S. at 870-71, 880 (holding Wisconsin Supreme Court's interpretation of regulation requiring "reasonable grounds" for warrantless search of probationer's residence

---

[5]The Manual requirements in effect at the time of the *Corgan* decision were identical to the Manual requirements in effect for purposes of this case, except that in *Corgan*, the Manual included a fifth requirement: that "the supervising officer's experience with the offender has documented a need for close supervision." *Corgan*, 868 P.2d at 746. The district court did not make any findings with respect to this requirement. Because we conclude that even in the absence of this additional requirement, the Manual requirements are reasonable for Fourth Amendment purposes, we do not address Cantley's argument that this requirement was not met.

satisfies Fourth Amendment reasonableness requirement); *Lewis*, 71 F.3d at 362 (concluding Utah prerequisites to warrantless search of a parolee's residence satisfies Fourth Amendment reasonableness requirement).

We must next determine whether the officers in this case carried out the search of Cantley's residence in accordance with the Manual. Cantley argues the search did not comply with the Manual because (1) there was no immediate threat; (2) the search was the result of a request from other law enforcement officers; and (3) the officers invaded the privacy of Ms. Cantley. This court concludes the Manual requirements were satisfied.

First, although Cantley apparently concedes there was an immediate threat to the public, employees, or offenders prior to conducting the search, Cantley argues the threat subsided once the officers determined he was not present at the residence. In *Corgan*, the court determined there was no immediate threat given that the "search was not conducted until almost a month after it was requested and authorized, and more notably, not until after [the defendant] was arrested [at his residence prior to conducting the search]. An 'immediate' threat would have required swifter action." *Corgan*, 868 P.2d at 747.

In this case, Officer Nelson conducted the search the day after receiving authorization, and, unlike the defendant in *Corgan*, Cantley was not arrested until approximately two weeks after the search. Given the evidence of Cantley's drug

dealings, his recent charge for illegal possession of a firearm, and the fact that he was not yet in custody, we agree with the district court's conclusion that failure to search may have resulted in an immediate threat to both the public and the law enforcement officers.

Second, Cantley argues that Officer Nelson was acting at the behest of law enforcement officers, namely OBN and DEA agents, who could not themselves obtain a search warrant. In *Corgan*, the court held that parole officers may not use their authority "to assist the police in evading Fourth Amendment warrant requirements." *Id.* Approximately six months prior to the date of the warrantless search and while on parole, the defendant in *Corgan* pleaded guilty to driving under the influence and possession charges. *See id.* at 744-45 & 745 n.2. The court noted these convictions "were sufficient to cause revocation" of the defendant's parole[6] and therefore concluded "[t]he [warrantless] search was not conducted for a parole purpose, as [the parole officer] did not need to search for additional evidence to justify revocation of [the defendant's] parole." *Id.* at 747. The court thus held the search was not conducted in compliance with the Manual. *See id.*

In this case, however, Cantley had only been charged with illegal

---

[6]In Oklahoma, the State may rely on a conviction as a basis for parole revocation if the judgment is final. *See Pickens v. State*, 779 P.2d 596, 598 (Okla. Crim. App. 1989).

possession of a firearm and had not yet been convicted of the offense. At a parole revocation hearing, Oklahoma law requires the State to prove "by a preponderance of the evidence that the terms of the accused's suspension [have] been violated." *Fleming v. State*, 760 P.2d 206, 207 (Okla. Crim. App. 1988); *see also Robinson v. State*, 809 P.2d 1320, 1322 (Okla. Crim. App. 1991). Because Cantley had not been convicted of the firearms charge, the State had to put forth other evidence to prove that Cantley had violated the terms of his parole in order to prevail at the revocation hearing.[7] Accordingly, there was a parole purpose for the search. Finally, although Cantley claims there was "subterfuge" among the parole officer and the OBN and DEA agents, he does not present any concrete evidence to support his claim but rather relies on innuendo and speculation. This court therefore agrees with the district court that the warrantless search of Cantley's residence was not the result of a request for assistance from other law enforcement officers who were unable to obtain their own search warrant.

Third, Cantley argues the officers invaded the privacy of Ms. Cantley without her consent when conducting the warrantless search. According to the

---

[7]The violation report did include two other bases for revoking Cantley's parole, marijuana use (almost a year-and-a-half earlier) and misrepresenting the truth. Because, however, the decision to revoke parole lies within the discretion of the trial court, *see Robinson*, 809 P.2d at 1322, the parole officer had reason to search Cantley's residence for contraband to bolster the State's argument that Cantley's parole should be revoked.

Manual, "When conducting a search where the offender is a cohabitant, the search will entail only the offender's assigned area of the residence, unless the third party agrees to a search of their area by signing [a consent form]." Probation and Parole Manual ch. 3, at 4 (Dec. 1, 1992). The officers searched only the common areas of the residence and the one bedroom Cantley had previously identified as his. Ms. Cantley's consent was not needed to search those areas. *See, e.g.*, *State v. West*, 517 N.W.2d 482, 491 (Wis. 1994) ("[T]he parole search may extend to all parts of the premises to which the probationer or parolee has common authority, just as if it were a consent search."); *State v. Johnson*, 748 P.2d 1069, 1073-74 (Utah 1987) (holding warrantless search of common areas of parolee's apartment, which he shared with his mother, was lawful even though parolee's mother may not have consented to the search); *see also* 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 10.10(d), at 778 n.89 (3d ed. 1996) ("If the . . . parolee is sharing living quarters with someone else . . . the [warrantless] search may nonetheless extend to all parts of the premises to which the . . . parolee has common authority."); *cf. United States v. Davis*, 932 F.2d 752, 758 (9th Cir. 1991) (rejecting co-defendant's argument that officers exceeded scope of warrantless search of probationer's residence when they searched safe which was under the apparent joint control of probationer and co-defendant, and stating item must be "owned, controlled, or possessed" by probationer in order for

-11-

item to fall within scope of warrantless search). As such, the search did not invade Ms. Cantley's right to privacy.

This court therefore holds the warrantless search of Cantley's residence was reasonable under the Fourth Amendment, as it complied with all four of the Manual requirements, which are themselves reasonable. *See Griffin*, 483 U.S. at 880; *Lewis*, 71 F.3d at 363.

Cantley also contends that the district court erred by denying his motion to suppress evidence seized during the search of the hotel room where he was arrested approximately two weeks after the search of his residence. The arresting officers received a tip from a confidential informant that Cantley was staying at the hotel. The evidence presented by the government at the suppression hearing showed that the hotel room was registered to "Darrell Rhone" and that Cantley was not a registered occupant of the hotel. Cantley presented no evidence whatsoever as to Rhone's identity, his relationship with Rhone, or why he was staying in Rhone's hotel room. The district court concluded that because Cantley failed to show he had a reasonable expectation of privacy in the hotel room, he lacked standing to challenge the search of the room.

In his brief, Cantley does not address the district court's conclusion that he lacked standing. Instead, he argues the search exceeded the allowable scope of a search incident to arrest. "It is fundamental law that a person desiring to have

evidence suppressed must first show he has standing to object to the search."

*United States v. Deninno*, 29 F.3d 572, 576 (10th Cir. 1994). The burden was thus on Cantley "to show by a preponderance of the evidence that [he] was personally aggrieved by the alleged search and seizure because it invaded [his] subjective expectation of privacy which society is prepared to recognize as reasonable." *United States v. Carr*, 939 F.2d 1442, 1444 (10th Cir. 1991). Because Cantley does not dispute the district court's finding that he lacked standing, we affirm the district court's denial of standing and do not address his argument that the search exceeded the allowable scope of a search incident to arrest.[8] *See Deninno*, 29 F.3d at 576 (affirming district court's denial of motion to suppress because defendant failed to address district court's conclusion that he lacked standing).

## B. Crack Cocaine Enhancement

Cantley next argues that the district court improperly sentenced him under the crack cocaine guideline. The PSR calculated Cantley's base offense level of 38 based on its determination that the "cocaine base" involved in the offenses was

---

[8]We note the district court's conclusion regarding standing of an unregistered hotel occupant is in accord with Tenth Circuit case law. *See Deninno*, 29 F.3d at 575-76 (noting defendant had not established reasonable expectation of privacy in motel room, which was registered in another's name); *Carr*, 939 F.2d at 1446 (same).

"crack cocaine."[9]  Cantley objected to the PSR, arguing that "cocaine base" for

purposes of U.S.S.G. § 2D1.1(c)[10] means only "crack cocaine" and that the

government had not met its burden of proving the cocaine base in question was in

fact "crack cocaine."  At the sentencing hearing, the district court specifically

found that the substances in question were crack cocaine based on "[t]he chemical

analysis; the observation of witnesses as to what they saw, [including] actually

rocking up cocaine; and . . . the testimony of people who made purchases of crack

cocaine."

We review the district court's factual findings for clear error and its

application of the Sentencing Guidelines de novo.  *See United States v. Kissick*,

69 F.3d 1048, 1051 (10th Cir. 1995).  At sentencing, the government must prove

by a preponderance of the evidence the amounts and types of controlled

substances related to the offense.  *See Deninno*, 29 F.3d at 580.

---

[9]The Sentencing Guidelines punish "crack cocaine" 100 times more harshly than other forms of cocaine.  *See* U.S.S.G. § 2D1.1(c).

[10]Note (D) to U.S.S.G. § 2D1.1(c) provides:  "'Cocaine base,' for the purposes of this guideline, means 'crack.'  'Crack' is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form."  The Sentencing Commission added this language, effective November 1, 1993, to explain that, for purposes of sentencing, "'forms of cocaine base other than crack (*e.g.*, coca paste, an intermediate step in the processing of coca leaves into cocaine hydrochloride, scientifically is a base form of cocaine, but it is not crack) [should] be treated as cocaine.'"  *United States v. Kissick*, 69 F.3d 1048, 1052 (10th Cir. 1995) (quoting U.S.S.G. App. C, Amend. 487 (Nov. 1, 1993)).

To support his argument, Cantley relies primarily on the chemical analysis reports, which identify the substances solely as "cocaine base."[11] The parties' stipulation, which was based on the chemical analyses, uses the terms "cocaine base" and "crack cocaine" interchangeably. For example, the stipulation on the substances found during the search of the hotel room states that the following evidence was tested: "Four clear plastic bags each containing individually wrapped rocks of cocaine base . . . ." The stipulation goes on to describe each of the bags as containing a certain number of grams of "crack cocaine."

Cantley agreed to the stipulation and did not object when it was read into the record. Moreover, the officers who conducted the searches all testified that the substances were "crack cocaine."[12] Finally, all the witnesses who testified they purchased drugs from or sold drugs to Cantley described the substances in question as "crack cocaine," testified that they witnessed the "rocking-up"

---

[11]The chemical analysis reports do, however, identify all the substances as "rock-like" or "chunky," not as powder or liquid.

[12]In fact, after the first officer testified, the trial judge addressed this very issue. The judge stated:

> Without objection, Mr. Nelson has looked at various exhibits and he has called the exhibits "crack cocaine" and he has said that this was tested in the lab and it was positive for crack cocaine. In the absence of any objection, I'm just assuming that somewhere there's floating around a stipulation . . . .

In response, the government noted the stipulation had been filed. The judge then asked whether defense counsel had discussed the stipulation with their clients and whether the clients agreed to the stipulation. Cantley's counsel responded in the affirmative.

process, or both.

Cantley's reliance on the use of the term "cocaine base" in the chemical analysis reports does not negate the officers', the witnesses', and the stipulation's identification of the substances as "crack cocaine." *Cf. United States v. Wilson*, 103 F.3d 1402, 1407 (8th Cir. 1997) ("It is irrelevant that the chemist did not specifically say 'this substance is cocaine base which is the same as crack' or words to that effect and [the defendant] has cited no authority for the proposition that the magic word 'crack' must always be used instead of the term cocaine base."). Further, contrary to Cantley's assertion, the district court properly relied on the testimony of witnesses concerning their personal drug transactions with Cantley and their observations of the "rocking-up" process. *Cf. United States v. Silvers*, 84 F.3d 1317, 1327 (10th Cir. 1996) ("We have held countless times that if no drugs are actually seized, the government can nevertheless prove the type and quantity of drugs attributable to the defendant through other evidence . . . ."), *cert. denied*, 117 S. Ct. 742 (1997); *United States v. Hall*, 109 F.3d 1227, 1235-36 (7th Cir.) (rejecting defendants' argument that government failed to prove cocaine base involved was crack cocaine and noting that witness testimony was "particularly persuasive given that the Guidelines define 'crack' with reference to how that term is used on the street"), *cert. denied*, 118 S. Ct. 153 (1997).

Cantley's reliance on *United States v. James*, 78 F.3d 851 (3d Cir.), *cert.*

*denied*, 117 S. Ct. 128 (1996), is thus misplaced.[13]  In *James*, the government offered no evidence to prove that the type of cocaine base possessed by the defendant was crack cocaine.  In this case, however, there was ample evidence that Cantley dealt in crack cocaine.  Finally, though we recognize the burden is on the government to prove the substances were crack cocaine, Cantley has presented no evidence whatsoever to show that the substances were not crack cocaine.

This court concludes the government's evidence was sufficient to establish by a preponderance of the evidence that Cantley dealt in crack cocaine.  Accordingly, the district court did not err by sentencing Cantley under the crack cocaine guideline.

## C.  Role in the Offense

Cantley next argues the district court erred by applying a four-level enhancement for his role in the offense pursuant to U.S.S.G. § 3B1.1(a), which provides:  "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4

---

[13]In *James*, the defendant pleaded guilty to possession and distribution of "cocaine base," but was sentenced under the crack cocaine guideline.  *See James*, 78 F.3d at 852-53.  The chemical analysis report identified the substance as "cocaine base."  *See id.* at 855.  At the plea colloquy, both the defendant and court referred to the substance as "cocaine base," whereas the government referred to the substance as "crack cocaine."  *See id.* at 856.  On appeal, the Third Circuit held the sentence was improper because the government did not prove the cocaine base was crack cocaine.  *See id.* at 858.

levels."

This court reviews the district court's factual findings as to the defendant's role in the offense under a clearly erroneous standard. *See United States v. Lacey*, 86 F.3d 956, 967 (10th Cir.), *cert. denied*, 117 S. Ct. 331 (1996). Questions of law regarding application of the Sentencing Guidelines are reviewed de novo. *See id.*

An application note to U.S.S.G. § 3B1.1 specifies several factors the district court should consider in determining a defendant's role in an offense, including

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 application note 4. "These factors are intended only to guide the analysis of the sentencing court, and the [G]uidelines do not require that each be satisfied for § 3B1.1 to apply." *Lacey*, 86 F.3d at 967.

As justification for the four-level enhancement of Cantley's sentence, the trial judge stated:

> [T]his was an operation that went over a year and nine months approximately, it went on in at least three different locations. It went on as a -- as an operation of considerable complexity that required the Houston source, some differentiation by the participants in their roles . . . .

-18-

Now, I'll specifically find that the trial testimony was such that it's established by a preponderance of the evidence that Mr. Cantley identified the people to be brought into this operation and recruited them into the operation; that he had an almost paternal role to play in it thereafter by supplying accommodations, clothing, food, refreshment, entertainment and a cash allowance to these people; that there's abundant evidence that what money changed hands, it ultimately made its way back to Mr. Cantley or to Sharon Cantley, who held it for Mr. Cantley; that Mr. Cantley gave advice and direction to other people as to how to run a drug business. . . .

I see no reason to count beyond five, but the five-person aspect of this is certainly satisfied by Mr. Cantley himself, who can be counted, Monica Carter, the two Mr. Warners, and Sharon Cantley, whose participation as members of the same operation is clear. And this is not a case in which the evidence establishes a few discrete, entirely separate, almost coincidentally separate sales to people. It was a business . . . .

Cantley apparently challenges both the district court's factual findings and its application of those findings to the Sentencing Guidelines. After carefully reviewing the record, we cannot say the district court's factual findings were clearly erroneous. For example, several of the government's witnesses testified that others in the conspiracy worked for Cantley; that Cantley paid his "crew" with cash and drugs and supplied them with lodging, clothes, and food; and that the crack cocaine sold at the various crack houses was all supplied by Cantley.

Further, we agree with the district court's assessment of Cantley's leadership role based on those findings. There is ample evidence that Cantley "'exercised some degree of control over others involved in the commission of the offense [and was] responsible for organizing others for the purpose of carrying

out the crime.'" *Lacey*, 86 F.3d at 967 (quoting *United States v. Reid*, 911 F.2d 1456, 1464 (10th Cir. 1990)). We therefore conclude the district court did not err by applying a four-level enhancement for Cantley's role in the offense.

### D. Burden of Proof

Cantley's final argument is that the district court erred by failing to require the government to assume the burden of proof with respect to contested sentencing issues. Cantley specifically argues the government did not meet its burden of proving the bases for sentence enhancements, namely the four-level enhancement for Cantley's role in the offense and the applicability of the crack cocaine guideline. Because this argument is subsumed by Cantley's previous arguments directly challenging these enhancements, we need not address this argument separately.

The judgment of the United States District Court for the Western District of Oklahoma is **AFFIRMED**.