(116 P.3d 728)
No. 91,631
No. 91,667

STATE OF KANSAS, *Appellee,* v. SANDRA PORTING, *Appellant.*
STATE OF KANSAS, *Appellee,* v. KIM D. ANGEL, *Appellant.*

Opinion filed August 5, 2005.

*Sandra Carr*, assistant appellate defender, and *Sam S. Kepfield*, of Hutchinson, for appellants.

*Thomas R. Stanton*, district attorney, and *Phill Kline*, attorney general, for appellee.

Before GREENE, P.J., CAPLINGER and BUSER, JJ.

CAPLINGER, J.: Defendants Sandra Porting and Kim D. Angel appeal the trial court's denial of their motions to suppress. They contend the trial court erred in finding that a recently released parolee had authority to consent to a search of the residence in which the evidence was found. We affirm, finding the State established by a preponderance of the evidence that (1) the parolee had common authority or sufficient relationship to the property to give valid consent to search the residence; and (2) the searching officers had reasonable grounds to believe the parolee had apparent authority to consent to the search.

The facts were stipulated to by the parties. On December 27, 2002, Eugene Hanson was released from the custody of the Kansas Department of Corrections at the Hutchinson Correctional Facility after serving approximately 18 months in prison. Prior to his imprisonment, Hanson had lived with his mother for several years at a residence located at 1130 West 20th Avenue in Hutchinson. Hanson's former girlfriend, defendant Porting, also resided at the 20th Avenue residence, and she and her children continued to reside there while Hanson was imprisoned.

Hanson's preapproved release plan required Hanson to reside at the 20th Avenue residence upon his release. Prior to his release, Hanson requested that his parole officer, Edward Mora, accompany him to the residence. Hanson did not want to jeopardize his parole status and was concerned because of rumored drug use by Porting.

Mora requested that Hutchinson police officers accompany Mora and Hanson to the residence to assist with clearing the residence for parole. When they arrived, Hanson entered the home and Mora followed. The two police officers remained outside. Hanson gave Mora consent to search the residence.

Hanson led officers to the northeast bedroom of the house, which Hanson had occupied with Porting prior to Hanson's incarceration and would occupy again upon his return. There, they encountered Porting and two men in the bedroom. One of the two men was defendant Kim Angel, an absconder from parole. Angel had personal belongings at the residence, had spent the prior night with Porting, and had been at the residence all day. .

Porting and Angel filed motions to suppress the evidence against them, arguing Hanson was not a resident as he had spent the last 18 months incarcerated and, therefore, did not have the authority to consent to the search. Following a hearing, the trial court denied the motions.

Porting and Angel were convicted separately, pursuant to bench trials on stipulated facts. The defendants preserved their objections to the admission of the physical evidence that resulted from the search of the house.

### Authority to Consent to Search

In these consolidated appeals, the defendants contend the trial court erred in finding Hanson had authority to consent to a search of the residence.

When, as here, the facts material to a trial court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which this court has unlimited review. *State v. Boyd*, 275 Kan. 271, 273, 64 P.3d 419 (2003). The State bears the burden of proving the lawfulness of the conduct in question by a preponderance of the evidence. *State v. Kriegh*, 23 Kan. App. 2d 935, 937, 937 P.2d 453 (1997).

Before considering the parties' arguments, we initially note that the parties stipulated that defendant Angel was an overnight guest. Angel thus had standing to object to the search. See *Minnesota v. Olson*, 495 U.S. 91, 109 L. Ed. 2d 85, 110 S. Ct. 1684 (1990) (overnight guests have expectation of privacy in home).

The defendants initially argue that although Hanson was a past and prospective resident of the 20th Avenue residence, he was not a resident at the time of the search. Thus, they conclude he lacked

access to or control of the property and could not have agreed to the search.

The trial court found Hanson had authority to consent because he was both physically present at the residence and intended to remain permanently. Although the trial court did not cite legal authority or support for its ruling, it appears the court analyzed the issue as one of residency of the defendant. See K.S.A. 2004 Supp. 77-201, *Twenty-third* (establishment of permanent residence requires physical presence in location and intent to remain there).

While we agree with the trial court's determination that Hanson was a resident of the 20th Avenue address, we affirm the trial court's ruling for a different reason. We find the State proved by a preponderance of the evidence that Hanson's consent to the search was a valid third-party consent.

In *United States v. Matlock*, 415 U.S. 164, 171, 39 L. Ed. 2d 242, 94 S. Ct. 988 (1974), the Supreme Court held that when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant. Rather, the State may show that permission to search was obtained from a third party who possessed common authority over the premises, or other sufficient relationship to the premises or effects sought to be inspected. See *State v. Savage*, 27 Kan. App. 2d 1022, 1026, 10 P.3d 765, *rev. denied* 270 Kan. 903 (2000).

*Matlock* was applied by this court in *State v. Ratley*, 16 Kan. App. 2d 589, 594, 827 P.2d 78 (1992). Although not entirely analogous, *Ratley's* holding is instructive. There, the defendant's wife left the parties' marital home for a "safe house" after being physically abused by her husband. Planning to return to recover personal belongings, she met with law enforcement and signed a written consent to search the marital residence. During the subsequent search, agents seized marijuana and marijuana plants. The trial court granted the defendant's motion to suppress, finding the wife had abandoned the marital home by no longer occupying the premises jointly with her husband.

This court reversed, finding the issue was not whether the wife and husband jointly occupied the premises but whether the wife

had mutual authority or other sufficient relationship to the premises at the time she gave the consent to search. 16 Kan. App. 2d at 591. Citing *Matlock,* the *Ratley* court noted: "Recent United States Supreme Court cases appear to be decided [based] on whether the third party had common authority to consent, not on whether the third party jointly occupied the premises." 16 Kan. App. 2d at 591.

Because the defendant's wife had fled to a "safe house," the court found she did not voluntarily surrender her control or access to the residence. Additionally, the court noted there was no evidence the husband had done anything to restrict or control access to the residence. The *Ratley* court thus concluded the defendant's wife had the authority to consent to a search of the residence. 16 Kan. App. 2d at 594.

Unlike *Ratley*, Hanson's absence from the residence for a period of time was due to his own actions rather than the violent actions of a spouse. Nevertheless, as in *Ratley,* there was no evidence that Hanson voluntarily and permanently surrendered control or access to the premises. Nor was there any evidence that anyone had changed the locks or attempted to restrict Hanson's access to the premises in any way.

Arguably, we are presented here with even more compelling evidence upon which to find authority to search than that relied upon by the court in *Ratley*. The defendant's wife in *Ratley* did not intend to return permanently to the marital residence but rather returned only to obtain her belongings. Hanson, on the other hand, indisputably intended not only to return to the home, but to reside permanently at the residence. In fact, he was required to reside there as a condition of his release. Moreover, Hanson had lived at the residence for several years prior to his incarceration, and his parole plan had been approved based upon his residing at the same location upon his release. Finally, upon his release, Hanson immediately returned to the residence.

Under these circumstances, we conclude the State established by a preponderance of the evidence that Hanson had common authority or sufficient relationship to the property to give a valid consent to a search of the residence.

### Apparent Authority to Consent to Search

The trial court's holding can also be affirmed under the apparent authority rule, " 'which makes valid a consent to search when the facts available to an officer would warrant a person of reasonable caution to believe the consenting party had authority over the premises to be searched.' [Citation omitted.]." 27 Kan. App. 2d at 1026.

In *Illinois v. Rodriguez*, 497 U.S. 177, 188-89, 111 L. Ed. 2d 148, 110 S. Ct. 2793 (1990), the Supreme Court determined that a consent to search is valid when the facts available to an officer would warrant a person of reasonable caution to believe the consenting party had authority over the premises to be searched. In *Ratley*, 16 Kan. App. 2d at 595, our court applied *Rodriguez*, finding that since the officers knew the parties were married and there was no evidence that the husband had moved to revoke the wife's authority or the wife had given up her authority, the officers could reasonably rely on the wife's apparent authority.

Several factors in this case support a finding that Hanson had apparent authority to consent to the search. He resided at the 20th Avenue residence with his mother and Porting for several years prior to his incarceration. His preapproved parole plan required that he reside at that address following his release, and he immediately returned to the residence upon his release. Moreover, there was no evidence whatsoever to suggest that Hanson was not welcome or permitted to return to the residence after his release. Given these factual circumstances, we conclude the State proved by a preponderance of the evidence that Hanson's parole officer could reasonably rely on Hanson's apparent authority over the premises to be searched.

### Search of the Bedroom

Defendants argue that even if Hanson did have the authority to consent to the search of the house, he did not have the authority to consent to a search of Porting's private bedroom. They argue the door was closed at the time the officer entered the house and was opened by Hanson, who was acting as the State's agent. Because the room contained Porting's personal, private belongings,

the defendants argue Porting had an expectation of privacy in the room. They point out that courts have repeatedly recognized that parolees do not have the authority to consent to search of another's private areas in a residence. *United States v. Cantley*, 130 F.3d 1371, 1376-77, (10th Cir. 1997); *State v. West*, 185 Wis. 2d 68, 94, 517 N.W.2d 482 (1984); *State v. Johnson*, 748 P.2d 1069, 1073-74 (Utah 1987), *abrogated on other grounds by State v. Doporto* 935 P.2d 484 (Utah 1997).

We are not persuaded. There is no indication Hanson was acting as an agent of the State, given that Hanson requested the search. Further, the record indicates Porting did not have exclusive control over the bedroom. Porting and Angel were found in Hanson's mother's home in the room Porting shared with Hanson prior to his incarceration and the room Hanson intended to occupy upon his return.

Finally, Porting argues that Mora, Hanson's parole officer, acted as a "stalking horse" for law enforcement officers, allowing them to evade the usual warrant requirements such as probable cause. We find this assertion equally unpersuasive. There is no indication that Mora collaborated with Hutchinson police to circumvent probable cause. Instead, Mora requested the police accompany Hanson and Mora to the residence. The police did not initiate any action and stood by outside during the search.

We thus find the district court did not err in denying the defendants' motions to suppress.

Affirmed.

GREENE, J., dissenting: I respectfully dissent, principally because I believe that the majority has unduly extended the "common authority" and "apparent authority" rules to validate a third-party consent to search a residence by someone who had no more than a hope or intention of resuming residence at that location after an 18-month absence, knowing that there were now others living there who may be doing drugs and with whom he did not wish to reside. Those "others" possessed a reasonable expectation of privacy under the Fourth Amendment that could not be waived by a

future occupant who lived there 18 months ago and merely "hoped" to reside there once again.

The facts here are critical. The parties stipulated as follows:

"Eugene Hanson lived at 1130 West 20th Street prior to serving a sentence with the Kansas Department of Corrections of approximately a year to a year and a half. He lived there at that time with his mother and with Sandra Porting. So both Miss Porting and the defendant lived there prior to him going to the Department of Corrections.

"When he was released from the Department of Corrections there was a proposed release plan developed by the Kansas Department of Corrections which identified his primary residence as 1130 West 20th Street. That was his mother's residence, and Miss Porting was still a resident of that house. When Mr. Hanson was released from the Department of Corrections he . . . went straight to the custody of Ed Mora who was to transport him to his primary residence; that primary residence being listed on his parole plan as 1130 West 20th.

"Mr. Hanson indicated he had concerns about possible drugs in the house and asked the [parole] officer, Ed Mora, to search the house for drugs in order to make sure . . . there were no drugs there as he entered the home. Upon entering the home the officer encountered Mr. Angel, who was an absconder from parole, and Miss Porting. Neither [Hanson's] mother, who . . . [had] passed away, nor the defendants gave consent to enter the home. It was only on the consent of Eugene Hanson that the home was entered. And drugs were subsequently found either on or in the proximity of both defendants."

Additionally, the parties stipulated that "Officer Mora entered into Miss Porting's *private* bedroom within the residence, which was the start of the finding of the drugs," and that "Mr. Angel was an overnight guest and he had been . . . there all day and that he had personal belongings with him at the residence." (Emphasis added).

The only other facts were established through the testimony of Officer Mora, who confirmed that "Mr. Hanson had some concerns that there was possibly some drug usage going on at the home and that there [were] people . . . living at the residence that he did not want living there any more and was afraid that when he went to the home that there may be some problems." Regarding Hanson's designation of the home as his intended residence, Mora had no reason to dispute that Hanson had been incarcerated for 18 months and designated the residence in his parole plan, but was concerned about people "living at the residence that he did not

want living there." Regarding Hanson's designation of this residence for purposes of his parole plan, Mora testified:

"Q. And isn't it true that if in fact you had gone over there and there was something wrong with the house that made it, in your opinion, inappropriate for Mr. Hanson to live there, you had the authority to deny him living in that house?

"A. Ultimately that would be his assigned parole officer, but, yes.

"Q. In the interim, if you would have gone there and you would have seen something that caused you grave concern about Mr. Hanson's welfare, safety, and potential for success on parole, you had the authority to tell him at that time you can't live here until we make other arrangements?

"A. Yes."

Moreover, the record is entirely unclear that Hanson's mother was living at the time of the search. Whether she died during Hanson's incarceration or during the pendency of proceedings against the defendants is unknown, but the parties' stipulation at trial gives no indication that any inquiry was made upon Hanson's mother at the time of entry into the residence or at any other time.

Highly summarizing other obvious omissions from these facts, the record does not indicate that Hanson had any interest in the property, does not indicate how long Hanson lived at the residence prior to incarceration, does not indicate whether his mother had approved his return, does not indicate whether he had personal effects at the residence, does not indicate whether he had conferred with the current occupants of the house regarding his hope or intent to return, does not indicate any spousal relationship with Porting, does not indicate whether Hanson had a key or how entry was otherwise obtained, and certainly does not speak to the extent of investigation by the parole officer into these issues. Instead, it is clear that Hanson was aware of potential "problems" with his return to this residence because of other occupants, and used his unique situation to press the parole officer into effectively evicting those "unwanted" occupants from the home by means of a warrantless search revealing their anticipated drug usage. I respectfully depart from the analysis and outcome of the majority opinion because I do not share the belief that validating such consent can be squared with the Fourth Amendment.

First, I believe that the majority's analysis cannot be squared with *United States v. Matlock*, 415 U.S. 164, 170-71, 39 L. Ed. 2d 242, 94 S. Ct. 988 (1974). Although the court in *Matlock* validated a search based upon the consent of a spouse, the court's "common authority" or "sufficient relationship" test is limited. The court stated:

"The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, . . . but rests rather on *mutual use of the property* by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that *the others have assumed the risk that one of their number might permit the common area to be searched.*" (Emphasis added.) 415 U.S. at 171 n.7.

Here, it simply cannot be said that Hanson had mutual use of the property after his 18-month absence without apparent arrangements to resume his occupancy, but most importantly, the "others" now living at the residence certainly had not assumed the risk that he would permit a search, since he was hardly "one of their number." The majority has departed from the "common authority" rule of *Matlock*.

Second, I believe that the majority's analysis cannot be squared with *State v. Ratley*, 16 Kan. App. 2d 589, 827 P.2d 78 (1992). Relying on *Matlock*, our court in *Ratley* adopted a case-by-case approach to the "common authority" test, but provided factors to be considered in determining if common authority exists:

"(1) the non-occupying spouse's retention of a key to the premises, (2) the non-occupying spouse's access to the property, (3) changed locks, (4) the length of time the non-occupying spouse is away from the premises, (5) whether the non-occupying spouse left personal property on the premises, and (6) the reason for the non-occupying spouse's departure." 16 Kan. App. 2d at 594.

Here, the record is silent as to many of these factors, *i.e.*, Hanson's retention of a key is unknown, whether the locks had been changed is unknown, and whether he left personal property in the premises is unknown. What is shown by the record is that he had not been in the property since being incarcerated, the length of time he was away was 18 months, and the reason for his departure was indefinite incarceration. Clearly, these factors weigh against Hanson's

"common authority" rather than support it, especially when it is considered that *Ratley* involved husband and wife, which the court specifically noted "ha[ve] been treated differently than [the relationship] between non-spouses," stemming "from their unique relationship which gives them a common authority and sufficient relationship arising from the marital bonds affecting all aspects of their lives." 16 Kan. App. 2d at 592. Hanson had no such "bonds" with Porting or the other occupants of this residence.

Third, the majority's alternative reliance upon the "apparent authority" rule is misplaced. This rule has its genesis in *Illinois v. Rodriguez*, 497 U.S. 177, 111 L. Ed. 2d 148, 110 S. Ct. 2793 (1990), in which the Court validated a search where the officers entering without a warrant reasonably—though erroneously—believed that the person providing consent was a resident. But the Court carefully restricted its holding, stating:

"[W]hat we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, *the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry*." (Emphasis added.) 497 U.S. at 188.

Precisely. And when Hanson told the authorities that he wanted them to accompany him to the residence because there were people living there with whom he did not want to live, I believe that any reasonable person would have made further inquiry regarding Hanson's degree of authority over these premises. The search cannot be validated on the "apparent authority" rule.

Fourth, I am concerned that the majority has shifted the burden of proof by presumptions based purely on lack of evidence. The State bears the burden of proving the lawfulness of a search by a preponderance of the evidence. *State v. Garcia*, 250 Kan. 310, 318, 827 P.2d 727 (1992). The burden cannot be met if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry. If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to common authority, warrantless entry is unlawful without further inquiry. See *Rodriguez*, 497 U.S. at 188-89. The gov-

ernment must therefore come forward with persuasive evidence in order to support third-party consent. *Rodriguez*, 497 U.S. at 181. The majority relies in part on the fact that "there was *no evidence* that Hanson voluntarily and permanently surrendered control or access to the premises. *Nor was there any evidence* that anyone had changed the locks or attempted to restrict Hanson's access of the premises in any way," and *"there was no evidence* whatsoever to suggest that Hanson was not welcome or permitted to return to the residence after his release." (Emphasis added.) I would not construe these evidentiary omissions in favor of the State. The State has the burden to show *affirmatively* that objective facts support Hanson's apparent or common authority, and the majority errs in "presuming" such supportive facts from a silent record.

Fifth, even if the case is closer as to entry into the residence, it is less close as to entry into the closed bedroom. The stipulated facts state that this was the "private bedroom" of Porting. There is absolutely no showing in the record to support Hanson's apparent or common authority over Porting's "private bedroom."

Finally, I fundamentally disagree with the concept that apparent authority is sufficient to support a search under these circumstances. Focus on "reasonableness" of the officer's belief rather than the voluntariness of a person's license to others to forfeit his or her expectation of privacy is not consistent with Fourth Amendment jurisprudence. What a person knowingly exposes to the public, even in his or her own home or office, is not a subject of Fourth Amendment protection; thus, an individual's decision to grant to another some degree of "authority" limits that individual's reasonable expectation of privacy and to that extent limits his or her Fourth Amendment protections. If an individual has *not* so limited his or her expectation of privacy, however, the police may not dispense with the safeguards established by the Fourth Amendment, notwithstanding the "reasonableness" of their belief of common authority. See *Rodriguez*, 497 U.S. at 189-90 (Marshall, J., dissenting). Although a panel of our court has embraced the apparent authority rule of *Rodriguez* in *Ratley*, I would not extend it to the facts of this case. Here, the occupants of a residence had their Fourth Amendment protections trampled as a result of Hanson's

mere designation of his prior residence in his parole plan, which the majority holds somehow clothed him with purported apparent authority to consent to search of the premises he had not occupied for 18 months and knew were occupied by "others." With all due respect to my colleagues, I would not consider this outcome consistent with current Fourth Amendment jurisprudence; the majority has taken away some of the liberty that the Fourth Amendment was designed to protect.

I would reverse the district court.