UNITED STATES of America, Plaintiff,

v.

**Valerie Marie SORENSON, Joseph Hyder, and Howard Dillon, Defendants.**

**No. 2:97–CR–336B.**

United States District Court,
D. Utah,
Central Division.

Oct. 7, 1998.

Richard McKelvie, Salt Lake City, UT, for Plaintiff.

Benjamin P. Knowlton, Salt Lake City, UT, for Defendants.

## ORDER ADOPTING REPORT AND RECOMMENDATION

BENSON, District Judge.

On October 29, 1997 defendants Valerie Marie Sorenson, Howard Dillon and Joseph Hyder were indicted on one count of possession of meperidine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Defendant Valerie Marie Sorenson filed a Motion to Suppress and later an Amended Motion to Suppress. Defendant Sorenson seeks to suppress syringes found at her residence on July 18, 1997, and a statement made by Sorenson to Detective Broadhead on August 1, 1997. She also sought to suppress statements made by her husband Joseph Hyder, but the Magistrate Judge properly instructed that such motion should be reserved as a motion in limine to be raised if the government attempts to use such evidence.

On August 20, 1998, the Magistrate Judge issued a Report and Recommendation in which it was recommended that defendant's Motion to Suppress as to the initial search of the residence and storage closet on July 18, 1997 be denied; that the evidence obtained from the second search, made by Officers Broadhead and Winters on the morning of July 19, 1997—without Officer Kelly's authorization—should be suppressed; and that the motion to suppress the statement made by Valerie Marie Sorenson to Officer Broadhead on August 1, 1997 be denied.

Defendant Valerie Marie Sorenson filed a timely objection to the Report and Recommendation and objects to the part of the Recommendation which finds that the initial search of the locked storage closet was lawful. Additionally, defendant Sorenson objects to the Magistrate Judge's finding that the initial search of the storage facility was within the scope of the supervised release agreement as an administrative search. The Government did not file a response to the Magistrate Judge's Report and Recommendation.

Having considered the Report and Recommendation, defendant Sorenson's objection, and other relevant materials, this Court

ADOPTS the Magistrate Judge's Report and Recommendation in its entirety and rules that defendant Valerie Marie Sorenson's Motion to Suppress is DENIED as to the initial search of the residence and storage closet of defendant Joseph Hyder and Valerie Marie Sorenson on July 18, 1997; that the evidence obtained from the second search, made by Officers Broadhead and Winters on the morning of July 19, 1997 should be SUPPRESSED; and defendant's Motion to Suppress the statement made by Valerie Marie Sorenson to Officer Broadhead on August 1, 1997 is DENIED.

## REPORT & RECOMMENDATION

BOYCE, United States Magistrate Judge.

Defendants, Valerie Marie Sorenson, Howard Dillon and Joseph Hyder, have been indicted on one count of possession of meperidine with intent to distribute (21 U.S.C. § 841(a)(1)) (File Entry # 1). The defendant, Valerie Marie Sorenson, made a motion to suppress and thereafter submitted an amended motion to suppress (File Entries # 37,44). A memorandum was submitted in support of the motion (File Entry # 38).

The defendant Sorenson seeks to suppress syringes found at her residence July 18, 1997, and a statement made by Sorenson to Detective Broadhead on August 1, 1997. Defendant also sought to suppress statements made by her husband Joseph Hyder which Sorenson contends involve privileged information (File Entry # 44).[1]

Hearing was held on the motion to suppress and defendant Sorenson submitted an updated memorandum (File Entry # 56). The United States submitted a memorandum in opposition to the defendant Sorenson's motion to suppress (Tr. p. 57). The case has been referred to the magistrate judge under 28 U.S.C. 636(b)(1)(B). This report and recommendation is submitted pursuant to the reference on the defendant Valerie Marie Sorenson's motion to suppress.

### Evidence

David Broadhead, a detective with the Salt Lake County Sheriff's Office, testified that he was assigned narcotics enforcement duties (Tr. p. 4). On July 18, 1997 Broadhead was investigating Joseph Hyder based on information Broadhead had that Hyder and his wife, defendant Valerie Marie Sorenson, were distributing meperidine syringes in Salt Lake County (Tr. p. 5). Through the use of an informant purchases of meperidine from Hyder and Sorenson had been made (Id.). The drug was manufactured through a legitimate pharmaceutical source (Tr. p. 6). Broadhead determined Hyder was a federal pretrial releasee and that Agent Steve Kelly was his probation officer. Broadhead also had information that Hyder and Sorenson had numerous meperidine syringes. The officer was concerned about a public health danger from the drug and based on information from medical personnel believed that there could be overdose deaths (Tr. p. 7). Mr. Steven Kelly, Hyder's probation officer, was contacted and Kelly was advised of what had transpired. This was on July 18, 1997, a Friday (Tr. p. 7). Because of the safety concerns, it was determined to proceed with an investigation. Hyder was actually on federal supervised release (Tr. p. 8) and the possibility of conducting a search of his premises was discussed. Kelly apprised Broadhead of the federal policies and procedures that were required (Tr. p. 8). Kelly requested that Broadhead and his officers assist him in the investigation and an attempt would be made to obtain Hyder's consent to a search (Tr. p. 9).

The officers approached Hyder at his residence, he was standing in the doorway. Broadhead and Kelly went towards Hyder who recognized Kelly, spoke to him and they shook hands (Id). Hyder invited both persons into the residence and asked if they would like to sit down. Kelly explained to Hyder the purpose of the visit and asked to check his residence. Hyder was very cooperative. He told Kelly about a small amount of marijuana in the residence, which was

---

1. The magistrate judge declined to treat that aspect of the motion as one to suppress and directed the matter be reserved for a motion in limine if the government is going to attempt to use such evidence (Tr. p. 3).

retrieved (Tr. p. 10). A *Miranda*[2] warning was given to Hyder who agreed to speak to the officers without an attorney (Tr. p. 10).

Two other officers entered the premises to help with the search and Kelly continued to speak to Hyder. Hyder said there were several boxes of meperidine syringes located in a storage closet at the residence. Hyder said the syringes had been put in the closet by defendant, Sorenson, who was not at home. The officers asked Hyder's permission to get a key for the closet from the manager and Hyder agreed. A detective Winters obtained a key for the closet from the apartment complex manager (Tr. p. 11). Eventually a bag containing seven boxes of syringes, ten in each box, were recovered as well as loose syringes (Tr. p. 12). No other search of the residence was conducted. Because of Mr. Hyder's cooperation and confession there was no extensive exploration of the residence, just a low key visual inspection. After recovery of the seven boxes, Kelly told Hyder of the concern about selling the syringes on the street. Hyder told Kelly of a large number of syringes and meperidine were in the possession of a friend of Hyder's, one Howard Dillon, also a defendant in this case. Hyder agreed to assist in getting the syringes back from Dillon (Tr. pp. 12–13). Hyder made some contact with Dillon who later arrived at the Hyder residence in a vehicle but then left without ever exiting the vehicle. The officers then left (Tr. pp. 13–14). Dillon was eventually located, Dillon said the syringes were in the same closet where the seven boxes were found at Hyder's residence. The officers and Dillon went back to the premises and Dillon pointed out the closet where he believed the syringes were located (Tr. p. 14). Dillon described a bag in which the syringes were located. They were in the storage shed, which was still unlocked with the door ajar (Tr. p. 15). Detective Winters went to the storage shed and found additional boxes (Tr. p. 15). The officers never encountered Valerie Sorenson (Id.). Hyder said he and Sorenson had had an argument and she had left (Tr. p. 16).

The first contact that Officer Broadhead had with defendant Sorenson was on August 1, 1997. She was in custody on an outstanding warrant and she telephoned the officer and wanted to relate her version of what happened as to the drugs. She was being held on an unrelated warrant (Tr. p. 16). Arrangements were made to meet with Sorenson at the Salt Lake County Jail. A meeting took place at the jail. Officer Broadhead gave Sorenson a *Miranda* warning. She stated she understood and agreed to speak without the presence of an attorney (Tr. p. 17). A conversation took place for about twenty minutes. Sorenson gave two different versions as to how she came in possession of the syringes (Tr. p. 18).

The controlled purchases, by the undercover persons, were made on July 14 and 17, 1997 (Tr. p. 19). A warrant for arrest or to search was not obtained at that time because the officer did not have experience with meperidine and had to obtain information from DEA and medical persons (Tr. p. 20). The syringes were lost from a shipment on May 5, 1997 (Id. p. 21). Hyder's residence was at 395 East 3360 South, Salt Lake County. Joseph and Valerie Hyder (Sorenson) were living there at an apartment (Tr. pp. 21–22). Steven Kelly was contacted by Officer Broadhead on July 18, 1997. There was discussion about getting a warrant but because of the perceived public danger, and because it was a Friday and the police were short of personnel, it was decided the police should assist Agent Kelly on a supervised release contact (Tr. pp. 23–24). Meperidine is demerol and about 100 mg. was in a syringe (Id.). Ms. Sorenson was not present and not on supervised release. A search warrant was not obtained (Tr. p. 25).

The storage facility which was locked was located across a parking lot from the residence (Tr. p. 26). It is part of a carport structure (Id.). Hyder had said the storage facility belonged to he and Valerie Sorenson and gave permission to the officers to search the storage closet (Tr. p. 27). Detective Winters got the key and conducted the search (Tr. pp. 27–30). Agent Kelly was inside the residence with Detective Broadhead, at the time (Tr. p. 30). The boxes of syringes were seven inches long and four inches wide, a

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

plastic container was inside with a lid on it and the syringes were under it (Tr. pp. 31–32).

Dillon arrived at the premises about an hour after the search began (Tr. p. 34). He left without making contact. He was located thereafter at about 3:15 a.m. and a search of the locker again occurred. No warrant was obtained for this search. Dillon and Detective Winters as well as Officer Broadhead were present for the second search (Tr. p. 36). Dillon had agreed with Agent Kelly to cooperate (Tr. p. 36).

Valerie Sorenson contacted Officer Broadhead by telephone from the jail and he went to the jail to speak to Sorenson (Tr. p. 37). She was questioned at that time after a *Miranda* warning (Id.).

All the syringes found at the Hyder premises were in the storage closet, the marijuana and some paraphernalia was found on the apartment premises (Tr. p. 39). Hyder told Agent Kelly about the syringes in the storage closet (Id.). Hyder said the syringes were in the closet, the officers were free to look, that the closet was locked and he believed his wife had the key. Sorenson was not there (Tr. p. 40).

Steven B. Kelly, United States Probation Officer, District of Utah, testified that Joseph Hyder was under Kelly's supervision in July, 1997. Hyder was on supervised release. Hyder was subject to conditions including a written agreement with a search and seizure clause (Tr. p. 41). The agreement provided "That the defendant submit to search and seizure of any areas accessible to the defendant. Such search and seizure to be conducted during reasonable hours, unless good cause is shown." (Tr. p. 42, Exhibit 2). (See also Special Conditions, Court paper, copy provided by Agent Kelly, Exhibit 4). Agent Kelly received a contact from Officer Broadhead on July 18, 1997 and was informed that Broadhead had an informant who had purchased drugs at Hyder's residence. The drug was meperidine hydrochloride (Tr. p. 43). Kelly advised Broadhead to get a search warrant (Id.). Broadhead later called Kelly back and said the officers could not get a warrant until Monday. Kelly had previously contacted the Probation Office duty offi-

cer, she was contacted again after Broadhead's second call and Kelly said she believed it was an emergency, with public safety risk and they should try to get the syringe off the street. Kelly said he knew the drug was dangerous and used for pain (Tr. pp. 44–45). The Probation office, Modigraph 109 is the guide for conducting searches and the preliminary steps to be taken. It discourages probation officer searches. Kelly attempted to obtain approval from the Chief Probation Officer, but he was not available (Tr. p. 46). However, eventually Kelly contacted the Chief Probation Officer by telephone (Tr. pp. 46–47). Kelly advised the Chief Probation Officer of the circumstances and was granted permission to do the search. Subsequently, a written document of approval was prepared on July 21, 1997(Id.) (Exhibit 2 is the written permission to conduct the search for which verbal permission had been given) (Tr. p. 48). Exhibit 3 is a memorandum to the Chief Probation Officer from Kelly as to what had occurred during the search on July 18, 1997 (Tr. p. 48).

After receiving permission of the Chief Probation Officer to conduct the search, Kelly advised Officer Broadhead that Kelly wanted the officers to assist Kelly on the search and that the search would be conducted in a reasonable fashion (Tr. p. 49). Kelly and the other officers went to Hyder's residence where Hyder was observed speaking with a woman. Greetings were exchanged and Kelly asked if they could enter and Hyder said yes. Hyder immediately began to shake. Kelly asked Hyder to sit down because Kelly was concerned about the way Hyder was shaking. Kelly introduced Broadhead and explained their problem and the concern over public safety. He said he wanted to get the dope back and would like to search pursuant to the supervised release search clause. Hyder said he didn't have any dope but the officers were welcome to search (Tr. p. 50). Kelly told Hyder that Kelly was aware of dope in the apartment and Hyder said there was marijuana in the drawer in the bedroom. Broadhead retrieved the marijuana. Kelly asked Broadhead to give Hyder a *Miranda* warning and it was done. Hyder said there was no more

dope in the apartment. Kelly told Hyder that Kelly was aware there was dope in a storage closet. Hyder said he was not going to lie and there were seven boxes in the closet (Tr. p. 51). Hyder said it was locked, that Valerie had left him the night before and she had the key. Kelly asked permission to search the closet and Hyder said there was no problem and gave consent for the search. He was very cooperative (Tr. p. 52).

After Hyder said the officers cold search, Officer Winters got a key from the manager and Kelly directed him to conduct the search. Winter brought back a sack of syringes (Tr. pp. 52–53).

Hyder asked Kelly how Hyder might help himself and told Kelly that Howard Dillon, who was also a supervised releasee on Kelly's caseload, had more syringes (Tr. p. 53). Hyder told Kelly how the syringes were obtained and that Dillon kept a large portion. Kelly then contacted assistant United States Attorney, Paul Warner for guidance. Kelly told Hyder his cooperation would be relayed to any prosecutor and Hyder agreed to contact Dillon (Tr. p. 54).

Dillon was contacted and told Hyder he would be over. Dillon drove in the parking lot, but then quickly drove away. Dillon's vehicle did not return. Kelly was anxious to get the syringes off the street and asked Officer Broadhead and Winters to accompany him to Dillon's residence. They went to Dillon's residence, he was not there. They talked to his girlfriend and she took them to a place where they met a woman who had taken Dillon to a hotel (Tr. pp. 54–56). The officers went to the hotel and contacted Dillon. Dillon told the officers the syringes were in the storage closet at Hyder's residence. A decision was made by Kelly to get Dillon and Hyder together and see who was telling the truth. However, Kelly had to take Dillon's girlfriend home and thereafter on making contact with Broadhead and Winters, Kelly found out they had already obtained the additional syringes from Hyder's storage closet (Tr. p. 57). This was at 3:30 am (Tr. pp. 56–57). Hyder did not withdraw his consent at any time (Tr. p. 58).

When Officer Broadhead first spoke to Agent Kelly he was informed that informants had made drug buys from Hyder (Tr. p. 59). Valerie Sorenson was not on supervised release (Tr. p. 60). The District of Utah probation policy disfavors probation searches (Pl. Exh.1, Tr. p. 61). Third party searches are to be avoided if a danger is presented because third persons may not be restrained (Id.). There was no such circumstance in this case. In the supervised release agreement (Exh. 4), the releasee was obligated to notify third persons of risks that may be occasioned by the releasee's criminal record or personal history or characteristics (Id.; Tr. p. 62). Valerie Sorenson was not present at the time of the search. Kelly delegated the authority to search the storage closet to the other officers, he stayed with Hyder (Tr. p. 64). Kelly was concerned about the relationship with Hyder, his responsibility to the court and the public, and in retrieving the drugs (Tr. p. 66). Hyder was anxious to make some kind of deal and was cooperative (Tr. pp. 68–69). Kelly was in his vehicle during the second search of the storage closet which was, later on, at about 3:15 am (Tr. p. 70).

Kelly had been at Hyder's residence on two or three previous occasions. Hyder was living at the residence with defendant Sorenson, and Kelly believed they were husband and wife (Tr. p. 73).

Based on the above evidence the court enters the following:

### Findings of Fact

1. In July, 1997 Officer David Broadhead of the Salt Lake County Sheriff's narcotics squad received information that defendant Joseph Hyder and defendant Valerie Marie Sorenson were distributing meperidine (demerol) syringes throughout Salt Lake County. Later, around July 14th, two undercover purchases of meperidine syringes were made at the Hyder residence. Valerie Marie Sorenson was apparently Hyder's wife.

2. An informant told the Sheriff's officer that Hyder and Sorenson had numerous boxes of meperidine syringes. The syringes, with the drug, were the product of a legitimate pharmaceutical source. Officer Broadhead had received information from health

provider personnel that the drug was potentially lethal and was a health risk. During his investigation, Officer Broadhead also determined that Hyder was a federal supervised releasee, under supervision of probation officer Steven Kelly of the Utah District Court probation office. On Friday, July 18, 1997, Broadhead contacted Mr. Kelly and informed him of the circumstances about Hyder and syringes. Broadhead sought Kelly's interest in a search of Hyder's premises. The Utah Probation office policy discourages probation searches and Kelly advised Broadhead to get a search warrant. Broadhead indicated he would attempt to do so. Later, Broadhead called Kelly back and advised him that because of lack of personnel and the fact it was Friday, a search warrant could not be obtained until Monday. Hyder's supervised release agreement contained a clause "That the defendant submit to search and seizure of any areas accessible to the defendant." Hyder rented at 395 East 3360 South, Apartment 31, Salt Lake City, Utah. Valerie Sorenson resided with Hyder and was apparently his wife. She had left him two days before and was not at the premises. Probation Officer Kelly had visited the premises on at least two prior occasions and knew who lived there. Sorenson knew Hyder's Status. Officer Broadhead again advised Kelly to the health risk involved.

3. Mr. Kelly then contacted his immediate supervisor and advised that it was an exigent circumstance. Under probation office policy for the District of Utah, Model Search and Seizure Guidelines have been adopted. The Chief Probation Officer must approve the search. The Chief Probation Officer was not physically available but was contacted by telephone and approved the search. Written approval was memorialized the following Monday. This did not comply with the Model Guidelines Office policy apparently allowing a search in an exigent circumstance with the Chief Probation Officer's approval, but there was substantial compliance. The departure did not effect the reasonableness of the search.

4. Upon receiving the authorization for the search, Kelly, Broadhead, and detective Winters went to the Hyder premises. Kelly asked Broadhead and Winters to assist him in the investigation. Hyder was cordial and invited the officers inside. Kelly told Hyder that Kelly was going to conduct a search under the search clause of the supervised release agreement. Hyder admitted to some marijuana in the bedroom and Kelly asked Broadhead to retrieve it which he did. Hyder initially told Kelly there were no other drugs on the premises. Kelly told Hyder that Kelly had information that there were syringes of drugs on the premises and Hyder admitted the syringes were in a storage closet adjacent to a parking port. He said they had been put there by Sorenson. Hyder said the officers could look but he did not have a key because defendant Sorenson had left him a couple of days before and probably had the key. The storage closet was an area accessible to Hyder and a space which he had a right to use and was using at the time. Officer Winters obtained a key to the storage closet from the apartment complex manager. Kelly told the two sheriff's officers to search the closet and Kelly stayed with Hyder who had been given a *Miranda* warning. Kelly delegated the search activity to the two Sheriff's officers. These officers opened and searched the closet finding seven boxes of syringes and some lose syringes all containing meperidine. The syringes were taken back to the apartment. No other search of the residence was made.

5. After recovery of the syringes, Hyder was interested in ameliorating his situation and told Kelly and the other officers that a friend, Howard Dillon, also had syringes. Dillon was also a supervised releasee on Officer Kelly's caseload. Hyder indicated he would assist in getting the other syringes, Dillon was contacted, and Hyder said that Dillon would be coming to the residence. A short time later, Dillon drove into the parking lot of the complex, but apparently became cautious and hurriedly left without getting out of his car. The officer went to Dillon's residence. He was not there but his girlfriend was present. The girlfriend assisted the officers to find Dillon who was eventually located at a hotel. Dillon advised the officers that other syringes were in the storage closet at Hyder's residence and they were put there by Dillon and Sorenson be-

cause she did not trust Hyder to know where the other syringes were.

6. At this point, Officer Kelly was not certain who to believe and wanted a face to face encounter with Hyder and Dillon to see who was telling the truth. Kelly needed to return Dillon's girlfriend to her residence. He did so, then intended to return to Hyder's premises. Dillon was handcuffed in the officer's car when Kelly took Dillon's girlfriend home. Dillon was transported by the officers to the Hyder apartment. On his way back to the Hyder residence, Kelly received a call from Broadhead who said Hyder was not there and the officers had searched the closet a second time and found the additional syringes. Kelly did not return to the Hyder premises. Kelly had not authorized the second search.

7. Officers Broadhead and Winters had taken Dillon to the Hyder premises where Dillon pointed out the closet where he believed the syringes were located. He described a bag in which the syringes were located. The officers, especially Detective Winters, then recovered the syringes. There is no evidence that Dillon or Hyder gave permission for the second search of the storage closet.

8. On August 1, 1997, Valerie Sorenson was in custody on another outstanding warrant. She telephoned Officer Broadhead from jail and said she wanted to relate her version of what had happened with regard to the drugs. Officer Broadhead met Sorenson at the Salt Lake County Metro Jail. Sorenson was given a *Miranda* warning. Sorenson acknowledged she understood her rights and agreed to speak to Broadhead without the presence of an attorney. A twenty minute conversation took place and defendant Sorenson made a statement. There is no evidence of any threats or police overreaching was employed to obtain Sorenson's statement.

### Consent To Search

■ The Government contends the search of the storage closet and premises at the Hyder/Sorenson residence was a consent search. The defendant contends the search was not consensual. The court agrees. Although Hyder was cooperative, and although Agent Kelly first indicated he intended to get consent to search, his testimony is clear that he advised Hyder that a search would be conducted pursuant to the search clause in Hyder's Supervised Release Agreement. That was the basis on which the search was conducted. Although Hyder did say the storage closet could be searched, it was after Kelly invoked his right to conduct the search. Under such circumstances, Hyder's cooperativeness cannot be considered consent. Indeed, Hyder first denied that he had any additional drugs than the marijuana he admitted to having in the bedroom. Later he did state that he had syringes in the storage closet. Although at that time, Hyder said the officers could look, he also stated he did not have a key. His statement had to be influenced by the fact that Agent Kelly had invoked the supervised release agreement search authority moments before.

■ In *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) officers went to the defendant's home where his grandmother was present. They advised the grandmother they had a warrant. There was in fact no valid warrant. The state attempted to claim the search was voluntary. The state contended the grandmother was fully cooperative and consented to the search. The Supreme Court held defendant could challenge the voluntariness of his grandmother's consent to search. In finding no consent, the Supreme Court said that the burden of showing consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." 391 U.S. at 548–549, 88 S.Ct. 1788. The court said:

> When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent.

391 U.S. at 550, 88 S.Ct. 1788.

There is no independent evidence that Hyder had any understanding he could refuse to consent to a search of the storage closet. Hyder did not go to the closet but was kept

in Kelly's presence in the apartment. Hyder told the officers Sorenson had the key. It was the officers who asked about getting a key from the complex manager. A consent search must be freely and voluntarily given based on the totality of the circumstances *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir.1998). One other than the subject of the search [here Valerie Sorenson] may give effective consent if the person has a sufficient relationship to the property searched. *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. McAlpine*, 919 F.2d 1461, 1463 (10th Cir.1990). However, the consent must at least meet the free and voluntary standard of *Schneckloth v. Bustamonte*, supra.

In *United States v. Leary*, 846 F.2d 592, 598 (10th Cir.1988) customs agents made a search based on a warrant later determined to be over broad. The court rejected consent as an alternative basis to uphold the search. It observed:

> Initially, we reject any suggestion that Leary and Kleinberg specifically consented to the August 23, 1984 search. When a government agent claims authority to search under a warrant, "he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." Bumper v. North Carolina, 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). In fact, the Supreme Court has stated that: "A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid." Bumper, 391 U.S. at 549, 88 S.Ct. at 1792.

846 F.2d at 598.

The court did acknowledge that not every search with an invalid warrant is initiated and consent might otherwise exists. *Id.* at p. 598, n. 9. However, the court found there was no ongoing consent. The same is true in this case. See *United States v. Medlin*, 842 F.2d 1194, 1198. (10th Cir.1988) (search initially based on a warrant could not be supported by a claim of consent); *United States v. Rodriguez*, 525 F.2d 1313, 1315 (10th Cir. 1975) (no consent where officers command action under their authority). See also *United States v. Nafzger*, 965 F.2d 213, 217 (7th Cir.1992) (search made under authority of an invalid warrant could not be upheld on the basis of consent).

In *United States v. Jones*, 1997 WL 224955 (D.N.D.Ga.1997) the court considered a situation where officers claimed a right to search because a third person was on probation who lived at the place that was searched. The court concluded that the search could not be sustained on the basis of consent. To the same effect is *United States v. Trzaska*, 866 F.Supp. 98, 104 (E.D.N.Y.1994) (acquiescence on a probation officer's authority to search is not consent).

Therefore, it is concluded the government's position that the search in this case was based on consent, cannot be sustained.[3]

### Authority For Probation Officer To Search Based On The Supervised Release Agreement

The United States asserts the search was lawful based on the search clause of the supervised release agreement. That provision authorized the probation officer to conduct a search of Hyder's premises and any part or areas accessible to the defendant. See Exhibit 4. The facts show that the premises and storage unit were part of the apartment rental and shared by Hyder and Sorenson. No evidence has been presented to the contrary. The apartment premises and storage unit were within the scope of the supervised release agreement.

█ The defendant seems to suggest a warrant should have been obtained or that exigent circumstances were necessary. The

---

**3.** The second search of the storage closet at 3:30 am was made without any approval of Hyder, who was not present. The government has not developed the record to show the authority of Dillon and what he said. He was under arrest at the time. The second search cannot be supported by consent on any fair interpretation of the facts.

facts do show some basis for a claim of exigent circumstances because of the possible danger from the distribution of the meperidine syringes. See *Roaden v. Kentucky*, 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973) ("now or never" circumstances); *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (exigent circumstances may arise even though probable cause existed for a long time [plurality four justices] ); *Cupp v. Murphy*, 412 U.S. 291, 294–96, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973); *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (danger to public safety).[4] However, exigent circumstances provide their own basis for search and seizure and an administrative supervised release search stands on a different and independent basis. The United States does not rely on exigent circumstances and the court rejects the need for independent exigent circumstances to justify a search under a search clause of a supervised release agreement. The exigency referred to in the Supervised Release Agreement is not the same as one that would authorize a warrantless search of a residence.

■ The fact that a warrant may or may not have been obtained is equally immaterial. If the search was proper as an administrative supervised release search, no warrant was necessary.[5] In this case, because of the prior distribution of syringes and informant information, there was both probable cause and reasonable suspicion that there were drugs (meperidine on the premises) and that Joseph Hyder had violated the conditions of his supervised release by the commission of new offenses. 18 U.S.C. § 3583(d) (1994). Further, there is probable cause that he was involved in ongoing violations. These facts required a mandatory revocation of Hyder's supervised release. 18 U.S.C. § 3583(g).

■ Although the law on probation, parole, and supervised release searches has received varying treatment from the courts, it is uniform in recognizing the authority of probation and other supervisory personnel to conduct searches of supervisees and their property without obtaining a warrant where there are reasonable grounds to believe a violation of a release condition is occurring by possession of contraband. *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); Thomas J. Gohert and Neil P. Cohen, *The Law of Probation and Parole*, §§ 6.02, 8.02–8.04 (1983). See *United States v. Sharp*, 931 F.2d 1310 (8th Cir. 1991) (supervised release condition could contain discrete authorization for a warrantless search). A search condition may be imposed on a supervised releasee. See 18 USC § 3583(d) ("... any other condition [the court] considers to be appropriate.").

In *Griffin v. Wisconsin*, supra, a warrantless search of a probationer's home was made by state probation officers. Wisconsin law subjected probationers to conditions set by the court. The state department supervising probationers allowed a probationers home to be searched without a warrant as long as the probation officer's supervisor approved and if there was reasonable grounds to believe contraband was present. A warrantless search under this standard was made. The court held the search was reasonable under the Fourth Amendment. The court said the Wisconsin regulations satisfied the reasonableness standard under the Fourth Amendment. *Id.* at p. 873, 107 S.Ct. 3164. The court further said state's "special needs" with regard to probationers could justify a departure from the usual warrant and probable

---

**4.** Whether the presence of a dangerous drug is enough to be an exigency is problematic. Without further evidence of danger, it cannot be said the mere availability of meperidine for distribution is itself an exigent circumstance. See *Richards v. Wisconsin*, 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615, (1997) (mere search for drugs does not provide an exigent exception to the knock and announce requirement).

**5.** The limitations the Probation Office put on its own exercise of its authority is not always a basis

for applying an exclusionary rule. *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). Therefore, any local policy cannot be a basis for a constitutional limitation on the officer's search authority unless necessary to make the search reasonable. The exclusionary policy must be determined by the needs of the Fourth Amendment. See also *Pennsylvania Bd. of Prob. & Parole v. Scott*, — U.S. —, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998).

cause requirement. The court said a warrant was not required and the state's special needs would be frustrated by a scheme imposing an intervening magistrate.

■ Applying *Griffin* to this case, it is apparent the carefully restricted policy of the Utah Probation Officer search policy was reasonable. Here exigent circumstances existed. It would have been ridiculous to leave a supervised releasee to continue to distribute drugs until the following Monday when a search warrant could be obtained. A federal statute made supervised release revocation mandatory under the circumstances 18 USC § 3583(g). Supervisor approval was obtained, there was a search clause in the supervised release agreement, and probable cause existed for the search. Recently, in *Pennsylvania Bd. of Prob. & Parole v. Scott,* —— U.S. ——, 118 S.Ct. 2014, 2017, 2020, 141 L.Ed.2d 344 (1998) the United States Supreme Court noted that parolees are more likely to be reoffenders and therefore to require special consideration. It held under such circumstances the exclusionary rule did not apply to parole revocation proceedings. In this case, Hyder had been shown to be such an offender. He was a supervisory releasee on a conviction of a felon in possession of a firearm and probable cause existed showing his violations of law while in a releasee status and his intent to continue to distribute drugs. It was reasonable to search his premises without a warrant where the contraband was identified as being located on the premises.

In *United States v. Lewis,* 71 F.3d 358, 360 (10th Cir.1995). The court considered a warrantless parole agent search of a parolee's home. There was a Utah parole agreement authorizing a warrantless search on reasonable suspicion. Reasonable suspicion of the parolee's sale of crack cocaine existed. The court said:

> We first conclude that the "special needs" of Utah's probation system justify a warrant exception in the parole context. See *Griffin,* 483 U.S. at 876, 107 S.Ct. at 3170 (approving Wisconsin's warrant exception in probation context). The parole system is "a controlled passageway between prison and freedom."

State v. Velasquez, 672 P.2d 1254 (Utah 1983). Parole agents necessarily exercise close supervisory powers over their subjects to assure a successful transition. To adequately monitor a parolee's progress and deter further criminal conduct, a parole agent must be permitted in the proper instance to act expeditiously and without warning. "[T]he delay inherent in obtaining a warrant would make it more difficult for … officials to respond quickly to evidence of misconduct and would reduce the deterrent effect that the possibility of expeditious searches would otherwise create." *Griffin,* 483 U.S. at 876, 107 S.Ct. at 3170. Further, we conclude that the prerequisites to a warrantless search of a parolee's residence in Utah comply with the Fourth Amendment's reasonableness requirement.

71 F.3d at 361–362.

The court also found the informant's tip relayed by police to the parole officer provided reasonable suspicion for the search. *Id.* at p. 363. The court concluded the search was related to the parole agent's duties because of legitimate concerns relating to the parolee's drug activities. *Id.* at p. 363. The court said a motion to suppress was properly denied.

In *United States v. McCarty,* 82 F.3d 943 (10th Cir.1996) the court upheld a Wyoming search of a probationer by a probation officer and police. The court applied *Lewis,* supra, and the "special needs" standard. The court stated a probation officer may not be a "stalking horse" on behalf of police to avoid Fourth Amendment warrant requirements. The case did not involve a warrantless search of a home but was involved with a warrant for a violation of a condition of probation, a circumstance not present in this case.

Recently, in *United States v. Cantley,* 130 F.3d 1371, 1375 (10th Cir.1997) the defendant contested a search of his residence. Defendant was an Oklahoma parolee. The search was without a warrant on approval of the parole district supervisor. The defendant's wife refused permission for the search, but the parole agent and accompanying officers acted over the wife's protest. *Id.* at p. 1374.

The court said there was reasonable cause for the search and it was done in compliance with the Oklahoma Probation and Parole Manual. The fact that the parole officer acted at the behest of police officers did not prevent the search because "there was a parole purpose for the search." *Id.* at p. 1376. The search was reasonable. On the issue of the invasion of the wife's privacy, the court said the search was lawful where it was in areas of common use or joint control. The court cited with approval the same conclusion from the Utah Supreme Court in *State v. Johnson,* 748 P.2d 1069, 1073–74 (Utah 1987). It also referenced 4 Wayne R. LaFave Search and Seizure § 10.10d and 778 n. 89 (3d Ed.1996):

> "If the ... parolee is sharing living quarters with someone else ... the [warrantless] search may nonetheless extend to all parts of the premises to which the ... parolee has common authority."

See also *United States v. Davis,* 932 F.2d 752, 758 (9th Cir.1991).

Other courts have taken a position the same as the reasoning of the Tenth Circuit. See *United States v. Conway,* 122 F.3d 841 (9th Cir.1997); *United States v. Watts,* 67 F.3d 790, 793–95 (9th Cir.1995); *United States v. Coleman,* 22 F.3d 126, 130 (7th Cir.1994); *United States v. Martin,* 25 F.3d 293 (6th Cir.1994); *United States v. Giannetta,* 909 F.2d 571 (1st Cir.1990). Unpublished decisions from the Tenth Circuit have announced the same principles and sustained searches under comparable standards and conditions. *United States v. Bass,* 1996 WL 408366, 91 F.3d 160 (10th Cir.1996); *United States v. Cannon,* 39 F.3d 1193, 1994 WL 637078 (10th Cir.1994); *United States v. Clark,* 1991 WL 274102, 951 F.2d 1261 (10th Cir.1991).

In this case, probable cause existed for the search. In addition, there was a search clause in the supervised release agreement.[6] The search was performed under the standards and policy of the District of Utah probation office. The probation officer, Steven Kelly, went to his immediate supervisor and then to the Chief Probation Officer who gave approval based on exigent circumstances. A written confirmation of the authorization was made following the search. Kelly was not the "stalking horse" for the police. Kelly initially advised the officers when Kelly was first approached, to get a search warrant. Because of the lack of personnel and the fact it was a Friday, a warrant from a state judge could not be obtained until the following Monday. This is when Kelly reconsidered. He was given information as to the dangerous nature of the meperidine syringes. He was concerned about making certain that court standards for federal supervised releases were complied with. Kelly directed the search and asked the officers to assist. A probation officer may ask for the help of officers and enlist their aid in a search without crossing over the proper line of "special needs" search.

Kelly also directed the functions of the officers and there was a supervised release interest in conducting the search. 18 U.S.C. § 3583. Valerie Sorenson was not present. Only areas accessible to Hyder were searched. Kelly properly stayed with Hyder and asked the Sheriff's officers to search the house and storage facility. Under such circumstances the initial search of the storage closet was lawful. *United States v. Cantley,* supra.

■ The second search of the storage closet cannot be sustained. It was not conducted pursuant to any consent given by Hyder. Hyder had left the premises and as far as he knew the officers had completed their search. He did not know a second search was going to be made. He gave no permission and believed that Dillon had his syringes stored someplace else. The record is insufficient to show voluntary consent by Dillon or that the search was made of the area under Dillon's supervised release agreement. The second search cannot be upheld on the basis of consent. *Bumper v. North Carolina,* supra; *Schneckloth v. Bustamonte,* supra.

---

6. For these reasons it is not necessary to consider whether the search clause would itself provide a consent basis for the search. See *State v. Benton,* 82 Ohio St.3d 316, 695 N.E.2d 757 (Ohio, 1998); *United States v. Ooley,* 116 F.3d 370 (9th Cir.1997). Also, the prosecution has not advanced such an argument.

■ The second search cannot be justified as a "special needs" search by Probation Officer Kelly. He did not authorize or direct the second search. It was hours after the exercise of the first search authorization. Dillon was taken to Hyder's residence by the police officers. Before that, Probation Officer Kelly had indicated he wanted a face to face confrontation between Hyder and Dillon to see who was telling the truth. Kelly did not authorize a second search. It was separate from the first and involved new evidence and persons. This is not a circumstance of a lost expectation of privacy. See *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Kelly was on his way to Hyder's residence when he received a page and on contact with the officers learned that Dillon had pointed out the storage closet where the other syringes were located and described a bag. The syringes were not in plain view. The officers had already retrieved the syringes when Kelly contacted them. Under those circumstances, the officers needed consent, which they did not have, or the probation officer's approval, which they did not have; or a warrant, which they did not have for either the closet or the bag. See *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). The second search of the closet by Officers Broadhead and Winters was unconstitutional. Both Hyder and Sorenson still had a privacy interest in the other syringes in the bag. That interest was violated and the second search evidence must be suppressed.

### Statement of Valerie Marie Sorenson

■ Defendant made a motion to suppress the statement she gave to Officer Broadhead at the Salt Lake County Metro Jail on August 1, 1997. On that date, Sorenson called Officer Broadhead and said she would like to give her version of events. Sorenson was at the jail on an unrelated warrant and charge and the instant charge had not been brought, so there was no Sixth Amendment involvement in the questioning. *McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (Sixth Amendment right to counsel is offense specific).

Broadhead met with Sorenson, she was given a *Miranda* warning and agreed to speak to the officer without counsel being present. There is no evidence of any police overreaching or that the statement was involuntary. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Sorenson's statement is admissible.

### Conclusion

The defendant Valerie Marie Sorenson's motion to suppress should be **Denied** as to the initial search of the residence and storage closet of defendant Joseph Hyder and Valerie Marie Sorenson on July 18, 1997. The evidence obtained from the second search, made by Officers Broadhead and Winters on the morning of July 19, 1997, but without Officer Kelly's authorization, should be **Suppressed.** The motion to suppress the statement made by Valerie Marie Sorenson to Officer Broadhead on August 1, 1997 should be **Denied.**

Copies of the foregoing Report and Recommendation are being mailed to the parties who are hereby notified of their right to object to the same. The parties are further notified that they must file any objections to the Report and Recommendation within ten (10) days after receiving it. Failure to file objections may constitute a waiver of those objections on subsequent appellate review.

August 20, 1998.